# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ARTHUR BEDROSIAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | Case No. 2:15-cv-05853 |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ORDER

AND NOW, this _____ day of _____, 20___, upon consideration of the

motion for summary judgment of plaintiff Arthur Bedrosian, and any opposition thereto, it is

hereby ORDERED and DECREED that the motion is GRANTED. Judgment shall be entered in

favor of plaintiff in the amount of $9,757.89 on his affirmative claim for illegal exaction.

Further, the government's counterclaim for the balance of the penalty assessed on July 18, 2013

is hereby DISMISSED.


BY THE COURT:



_____
THE HONORABLE MICHAEL M. BAYLSON

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARTHUR BEDROSIAN, | ) | |
| | ) | |
| **Plaintiff,** | ) | Case No. 2:15-cv-05853 |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## PLAINTIFF ARTHUR BEDROSIAN'S
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Arthur Bedrosian hereby moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. In support thereof, plaintiff relies upon the accompanying memorandum of law and statement of undisputed material facts, which are incorporated herein by reference.

Respectfully submitted,

/s/ Patrick J. Egan
Patrick J. Egan, Esquire
Beth L. Weisser, Esquire
Fox Rothschild LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103

*Attorneys for Plaintiff Arthur Bedrosian*

Dated: December 5, 2016

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARTHUR BEDROSIAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:15-cv-05853 |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF ARTHUR BEDROSIAN'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Arthur Bedrosian ("Bedrosian") hereby submits this memorandum of law in support of his motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 on his affirmative claim for illegal exaction and on the Internal Revenue Service's counterclaim for the balance of the amount of the penalty assessed for plaintiff's purported willful failure to file TDF 90-22.1. Additionally, plaintiff relies upon his statement of Undisputed Material Facts, which is incorporated herein by reference.

## I.    INTRODUCTION/FACTUAL BACKGROUND

Plaintiff is a long time Executive Officer in the generic pharmaceutical industry who has been working and paying taxes to the Internal Revenue Service since the age of 17. Up until approximately 1970, plaintiff prepared his own tax returns. During the 1970's, plaintiff frequently travelled overseas for business and, at some point during those travels, he opened a simple savings account with Swiss Credit Corporation ("the Bank") and deposited $100.00. The account was intended to simplify plaintiff's travels by having a local bank that was recognized throughout Europe as opposed to relying on travelers checks, as was customary at the time. The Bank was later acquired by Union Bank of Switzerland ("UBS"). Plaintiff made occasional after tax deposits with UBS by regular check or wired funds from one of his US checking accounts.

At some point during the 1990s, plaintiff made his then accountant – Seymour Handelman – aware of the existence of this foreign account. Handelman told plaintiff to leave the account as it was and that he (or his estate) would pay taxes on the money when it was repatriated. Plaintiff relied upon and followed the advice of his long time accountant. In the early 2000s, UBS offered to make a loan to the plaintiff's account at a 2% interest rate for investment purposes, which would be collateralized by the existing account. The loan was set up as a subaccount under the existing account.

Handelman passed away in 2006. As a result, Plaintiff engaged Sheldon Bransky to prepare his tax returns. It was Plaintiff's custom to collect relevant financial documents during the year and forward them to his accountant who would then prepare his returns. Bransky prepared the 2007 return identifying both that Plaintiff had an overseas account and identifying UBS as the depository. He also prepared and filed an FBAR on Plaintiff's behalf for calendar year 2007. The original 2007 FBAR inadvertently omitted one account.

In approximately 2009, plaintiff came to learn that he needed to fully report the existence of his overseas account and could not simply pay taxes on the money when it was repatriated, as he had previously been advised. He approached his attorney to discuss how to proceed and the law firm engaged a forensic accountant, Stewart Farber, to prepare amended returns and to file the appropriate FBAR reports. In August 2010, plaintiff filed FBAR reports for 2006, 2007 and 2008. In October 2010 he filed an FBAR report for 2009.

In April 2011, plaintiff was contacted by the IRS and notified that his 2007 and 2008 tax returns had been selected for examination. Accompanying that letter was an Information Document Request ("IDR"), seeking certain items from the plaintiff, such as sources of taxable and non-taxable interest (both foreign and domestic), substantiation for all cash contributions,

2

documents detailing the purchase date and price of investments during that tax year, and statements from banks, brokerages, etc. In October 2011, plaintiff and his representative met with IRS Revenue Agent John West and Group Manager Michael Enz. Plaintiff provided – or had already provided – all of the documents sought in the IDR and, according to Agent West, plaintiff was "very, very cooperative" during the interview. From that point until November 2012, Agent West continued his examination of plaintiff. During the course of the investigation, Agent West requested and received plaintiff's FBAR reports for 2006-2009. Agent West testified that he took all of those filed FBARs into account when determining how to proceed with this matter. Agent West ultimately determined, based on the totality of his investigation, that plaintiff's violation of the FBAR requirements was non-willful. In September 2012, Agent West and the Group Manager Enz met with the treaty case panel to review plaintiff's case. The treaty case panel – consisting of subject matter experts on offshore issues, including counsel – recommended that plaintiff's case be closed with non-willful violations, thereby substantiating Agent West's conclusions.

Approximately two months after Agent West and Group Manager Enz met with the treaty panel, Agent West went out on an unexpected medical leave for approximately four months. When he departed, plaintiff's case was reassigned to Agent Pamela Christensen for closure. However, Agent Christensen did not close the case. Almost immediately upon receiving the file, Agent Christensen decided that the penalty proposed by Agent West was not correct, even though Agent West had conducted approximately 18 months of investigation, interviewed the plaintiff, made a determination, and that determination was consistent with the recommendation of the offshore subject matter experts on the treaty case panel. Consequently, Agent Christensen conducted her own investigation and relied on information that was clearly contradicted in order

to justify her pre-determined outcome. Agent Christensen never spoke with Mr. Bedrosian, nor did she speak with Agent West about his 18+ months of investigation. More importantly, Agent Christensen was unaware that Plaintiff had reported a foreign account and filed an FBAR in 2007.

On or about July 18, 2013 the IRS imposed upon the plaintiff a willful penalty for failure to file TDF 90-22.1. The maximum value of the account was $1,951,578.34 and the amount of the penalty was $975,789.17 – half the value of the account, and the highest penalty that could be imposed. On August 15, 2013, plaintiff submitted a written protest of the determination. On or about February 5, 2015 the IRS informed plaintiff that he had failed to present adequate evidence to reduce or eliminate the FBAR penalty. On August 26, 2015, plaintiff made a partial payment of the FBAR penalty to the Department of the Treasury in the amount of $9,757.89.

Plaintiff filed this lawsuit on October 27, 2015 and asserted a claim for illegal exaction, arguing that the defendant's imposition of a willful FBAR penalty and the sustaining of such penalty after plaintiff's protest has resulted in $9,757.89 being improperly paid, exacted, or taken from plaintiff in contravention of the Constitution, a statute, or regulation, including but not limited to 31 U.S.C. § 5321 and the Fifth Amendment to the Constitution. *See* Complaint, Doc. No. 1. On February 26, 2016, the IRS filed an Answer and Counterclaim, seek the balance of the penalty assessed plus interest and other penalties for a total of $1,007,345.48 plus statutory additions. *See* Doc. No. 5.

Plaintiff now moves for summary judgment because the evidence clearly demonstrates that his conduct was not willful and that he undeniably satisfies all four criteria justifying the imposition of a penalty that is less than the maximum permitted by law.

## II. STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32 (1986); *Medical Protective Co. v. Watkins*, 198 F.3d 100, 103 (3rd Cir. 1999). Any inferences "to be drawn from the evidence . . . must be viewed in light most favorable to the party opposing the motion." *Todar v. Bowman*, 872 F.2d 43, 46 (3rd Cir. 1989). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Joseph v. Hess Oil*, 867 F.2d 179, 182 (3rd Cir 1989). Although the party seeking summary judgment initially must identify which parts of the record demonstrate the absence of issues of material fact, it is incumbent on the party opposing the motion to set forth specific facts that show the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 323.

A non-moving party may not merely rely on the allegations in its pleadings in response to a motion for summary judgment. *Id.* If the moving party shows that there is no evidence supporting the non-moving party's claims, the moving party is entitled to judgment as a matter of law on those claims. *Pennoyer v. Marriot Hotel Servs., Inc.*, 324 F.Supp. 2d 614, 617 (E.D. Pa. 2005).

## III. LEGAL ARGUMENT

### A. This Court Should Enter Summary Judgment in Favor of Plaintiff Because The Plaintiff's Actions Do Not Amount to a Willful Violation.

In order to sustain a "willful" penalty under 31 U.S.C. § 5321(a)(5), the government must show that plaintiff's actions amount to a "voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991). *Cheek* examined the meaning of "willfully"

as it is used in 26 U.S.C. §§ 7201 and 7203. The Court in *Cheek* explained that "[t]he proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws." *Id.* at 200. In fact, it is the complexity of the tax laws that prompted the Court to "carve out" an exception – that is, the interpretation of "willfully to mean a knowing violation' – to the traditional rule that ignorance of the law or a mistake of law is no defense to criminal prosecution. In *Cheek*, the Court discussed a previous line of criminal tax cases that "construed the willfulness requirement in the criminal provisions of the Internal Revenue Code to require proof of knowledge of the law." *Cheek*, 498 U.S. at 205. The Court went on to say that "[t]his was because 'in our complex tax system, uncertainty often arises even among tax payers who earnestly wish to follow the law,' and '[i]t is not the purpose of the law to penalize difference of opinion or innocent errors made despite the exercise of reasonable care.'" *Id.*, citing *United States v. Bishop*, 412 U.S. 346, 360-61 (1973) (quoting *Spies v. United States*, 317 U.S. 492, 496 (1943)). In *United States v. Murdock*, 290 U.S. 389 (1933), the Court interpreted the term "willfully" as used in the criminal tax statutes generally to mean "an act done with a bad purpose" or "with an evil motive." 290 U.S. at 394-395.

In order to establish willfulness, the government must show that the plaintiff had a specific intent to violate the statute at issue, that "the law imposed a duty on the [plaintiff] .... the [plaintiff] knew of this duty, and .... he voluntarily and intentionally violated that duty." 498 U.S. at 201. The government cannot simply rely on plaintiff's mistake or misunderstanding of a "complex tax system" to support a willful violation.

In *Ratzlaf v. United States*, 510 U.S. 135 (1994), the Court addressed the willfulness element of a structuring violation under the Bank Secrecy Act. Ratzlaf was charged with

6

"structuring" transactions with financial institutions in such a way to evade the requirement that the institution report transactions in excess of $10,000. 510 U.S. at 137. He was convicted under a statute that made it illegal to "willfully" structure transactions in order to avoid the reporting requirements. His conviction was based on a jury instruction that only required a finding that the defendant was aware of the reporting obligation and attempted to evade the obligation, without requiring a specific finding that the defendant was aware that his attempt to avoid the reporting was illegal. *Id.* at 137-138. The court reversed, and held that in order to convict Ratzlaf of the crime with which he was charged, a jury had to find that he *knew* the structuring in which he engaged was unlawful. *Id.* at 149 (emphasis added).

Finally, the Internal Revenue Manual provides the following hypothetical to help elucidate the willfulness standard:

> A person files the FBAR, but omits one of three foreign bank accounts. The person had previously closed the omitted account at the time of filing the FBAR The person explains that the omission was due to unintentional oversight. During the examination, the person provides all information requested with respect to the omitted account. The information provided does not disclose anything suspicious about the account, and the person reported all income associated with the account on his tax return. The penalty for a willful violation should not apply absent other evidence that may indicate willfulness.

IRM 4.26.16.6.5.1 (11-06-2015). This hypothetical – in the Internal Revenue Manual – bears striking similarities to plaintiff's situation. His 2007 FBAR disclosed one account but, due to unintentional oversight, neglected to list a second account. During the examination, the plaintiff provided all information requested with respect to the omitted account and that information did not disclose anything suspicious. Further, plaintiff had voluntarily filed an amended return for the year in question, as well as other years, prior to the examination. The amended return disclosed both accounts. *See* Stmnt. of Facts, ¶ 13 (US0258 – 0259).

1.    **Plaintiff Disclosed The Existence of a Foreign Bank Account on
His 2007 and 2008 Tax Returns and Filed FBAR Reports**

Here, the government is unable to show a "voluntary, intentional violation of a known

legal duty" by the plaintiff, as it is required to do. IRM 4.26.16.6.5.1 (11-06-2015). The burden

of establishing willfulness is on the government. *Id.* Furthermore, the government cannot show

that plaintiff knew that his failure to report his overseas accounts was unlawful. The following

facts undermine the government's determination of willfulness:

- On plaintiff's 2007 tax return he answered **YES** in response to the question of "[a]t any

  time during 2007, did you have an interest in or a signature or other authority over a

  financial account in a foreign country, such as a bank account, securities account, or other

  financial account?" *See* Stmnt. of Facts, ¶ 10 (US0008 – US00011 at US00011, Question

  7a).

- In response to the follow-up question of "If 'yes,' enter the name of the foreign country,"

  plaintiff responded "Switzerland." *See* Stmnt. of Facts, ¶ 10 (US00011, Question 7b).

- Plaintiff provided the same responses on his 2008 return. *See Stmnt. of Facts,* ¶ 37

  (US00043, Questions 7a and 7b).

- In October 2008, plaintiff filed an FBAR for calendar year 2007, listing one account with

  a value between $100,000 and $1,000,000.00. *See* Stmnt. of Facts, ¶ 11 (US0243).

- Before the government had even commenced its investigation, plaintiff had filed FBARs

  for years 2006-2009. See Stmnt. of Facts, ¶ 13.

Agent West testified as follows regarding plaintiff's filing of FBARs:

Q.    Sir, I'm showing you a letter dated April 17, 2012 from Stewart Farber and it has
several attachments which purport to be Mr. Bedrosian's FBAR reports for '06, '07, '08 and '09,
correct?
A.    Uh-huh.  Yes.
Q.    And do you remember getting this?

A.    I don't remember getting this specifically but I must have.

Q.    And you would agree with me that these are FBARs which were prepared for the years 2006 through 2009; correct?

A.    Yes, sir.

Q.    ……. [t]his is 2006; correct?

A.    Yes, it is.

Q.    And it was filed in August of 2010; correct?

A.    Yes.

Q.    And that was, again, before you received your assignment in this matter?

A.    That is correct.

Q.    And then if you go to page 4, which is US0098, that's for the year 2007, correct?

A.    That is.

Q.    And that was filed in 2010, correct?

A.    Yes, it was.

Q.    Which, again, is before you were assigned this matter?

A.    That's correct.

Q.    And if you go back to US100, which is another two pages back, that is for 2008, correct?

A.    Yes, sir.

Q.    Again, filed in August of 2010?

A.    That's correct.

Q.    And again, before you began your examination?

A.    That's correct.

Q.    And finally 2009, it's a year you weren't really examining, I don't think, but it was filed in October 2010, correct?

A.    That's correct.

Q.    So you received all of these and you took all of this into account I assume when you were making your determination as to what to do with this file?

A.    That is true.


*See* Stmnt. of Facts, ¶ 21. The evidence demonstrates that plaintiff filed tax returns for 2007 and

2008 wherein he disclosed the existence of a Swiss bank account and, prior to the government

even commencing its investigation of plaintiff, he had filed FBARs for 2006-2009. This degree

of voluntary disclosure to the IRS is entirely inconsistent with a willful violation.[1] Voluntary

---

[1] Other cases finding a willful violation are easily distinguishable. *See, e.g. U.S. v. McBride*, 908 F.Supp.2d 1186 (D. Utah 2012) (defendant responded "No" to question 7a on 2000 and 2001 return despite having foreign bank account, failed to produce documents requested by the IRS during investigation, and lied to the IRS during interviews); *U.S. v. Williams*, 489 Fed.Appx. 655 (4th Cir. 2012) (defendant responded "No" to question 7a on tax return and failed to file FBAR for the year in question; defendant also pled guilty to a criminal information charging him with conspiracy to defraud the IRS and criminal tax evasion and acknowledged that he willfully failed to report

disclosure to the IRS – even if the disclosure was inadvertently incomplete - is simply inconsistent with a voluntary and intentional violation of a legal duty.[2] The Internal Revenue Manual states that "[t]he government may base a determination of willfulness on inference from conduct meant to conceal sources of income or other financial information" (IRM 4.26.16.6.5.2 (11-6-2015) but here, you have the plaintiff filing tax returns disclosing to the IRS the existence of a foreign account and the country associated with that foreign account. Even if plaintiff's disclosure was incomplete, it certainly wasn't an attempt to conceal the information such as would be consistence with a willful violation.

Furthermore, there is no evidence that plaintiff knew that his failure to report the existence of the accounts earlier was unlawful. To the contrary, based on the advice of his then accountant, he believed that he could pay taxes when the money was repatriated. Once he became aware of the need to report the accounts prior to repatriation, he promptly engaged law and accounting professionals to voluntarily rectify the situation. While generally limited to the reasonable cause exception, under certain circumstances a taxpayer's reliance on the advice of a tax advisor may apply to other penalties when the tax advisor provides advice on the substantive tax issue. IRM 21.01.1.3.3.4.3(2) (12-11-09). Here, plaintiff followed the advice of his now-deceased accountant, Seymour Handelman, as to when he was required to report income from the UBS account. Plaintiff notified Mr. Handelman of the existence of his overseas accounts

---

the accounts as part of his allocution); *In re Cohen*, 522 B.R. 232 (Bankr. C.D. Ca. 2014) (failure to file FBAR for relevant years and filing of tax returns verifying that no foreign accounts existed evidence willful behavior).

[2] In the context of bankruptcy litigation, a voluntary disclosure (even after making false or incorrect statements under oath) is evidence of innocent intent. *See, e.g. In re Dolata*, 206 B.R. 97 (Bankr. W.D. Pa. 2004); *In re Kelly*, 135 B.R. 459, 461 (Bankr. S.D.N.Y. 1992) ("[I]t is well established that the court may consider the debtor's subsequent voluntary disclosure evidence of innocent intent" and finding that, although the debtor's statements at a meeting of credits "were clearly false, his subsequent prompt and voluntary actions to set the record straight went a long way toward vitiating his impropriety.") Here, plaintiff's identification of a foreign account, filing of an FBAR n 2007, and subsequent filing of additional FBARS – all **prior to the government's investigation** – certainly defeat a claim of willful violation.

some time during the 1990's. *See* Stmnt. of Facts, ¶ 6. Plaintiff informed Mr. Handelman that he intended to leave the money in the foreign account to his children. Mr. Handelman told the plaintiff that when his children repatriated that money, they would have to pay taxes on it. *See* Stmnt. of Facts, ¶ 8. He also told plaintiff to leave the account alone for the time and that plaintiff's estate would simply pay the taxes on it when plaintiff died. *Id.* Mr. Handelman used the example of reporting capital gains on the sale of stock or real estate: until you sold the stock or real estate, there was no requirement to report the gain. Mr. Handelman provided advice on a substantive tax issue – now known to be the wrong advice – and plaintiff relied upon it. This further negates any "willful" intent on the part of plaintiff – he was simply following the advice of his tax professional.

### 2. Agent Christensen Does Not Recall Reviewing Plaintiff's 2007-2008 Tax Returns or His 2007 FBAR

Agent Christensen – who single handedly undid Agent West's determination that was reached after 18 months of investigation and supported by the treaty case panel – does not even recall whether she reviewed plaintiff's 2007 and 2008 tax returns or his 2007 FBAR before reaching the conclusion that he had willfully failed to file just that – an FBAR report for 2007. Agent Christensen testified as follows:

> Q. …. Now, you testified, I believe, you don't remember what years' tax returns were in the file when you got it, right?
> A. Yes.
> Q. Okay. So you're not sure – you have no way of knowing if you had seen Mr. Bedrosian's 2007 return when you made your determination?
> A. Yes.
> Q. I'm showing you what's been marked as Plaintiff's Exhibit 4. It's US8 through US11. It's the 2007 return of Mr. Bedrosian. Do you see that?
> A. Yes.

*   *   *

Q.      And if you could go to the bottom of the last page, page 11 or US11, under the last section, foreign accounts and trusts, 7A, at any time in 2007 did the taxpayer have an interest in a foreign account and it says yes, correct?

A.      Yes.

Q.      And it says in Switzerland?

A.      Yes.

Q.      Now, you made no note of anything related to this in your log and your lead sheet?

A.      No, I did not.

Q.      Okay. But you would agree with me this indicates that in 2007 the taxpayer filed a return showing that he had a foreign bank account?

A.      Yes.

                        *       *       *

Q.      I'm showing you what's been marked P14 and it's Bates stamped US136 and it's a – what is this thing?

A.      It's an FBAR form.

Q.      And what's it dated?

A.      10/14/2008

Q.      And it's in the name of Mr. Bedrosian, correct?

A.      Yes.

Q.      And it states that he has a UBS account?

A.      Under $1 million, yes.

Q.      Correct. $100,000 to $1,000,000, correct. Do you recall seeing this before your determination?

A.      I don't recall.

Q.      And certainly you don't mention it at all in your lead sheet?

A.      No.

                        *       *       *

Q.      And I want to show you what's been marked as Plaintiff's Exhibit 6 previously, and you'll note that this is a page from a Schedule B from the 2008 tax return; correct?

A.      Yes.

Q.      And it seems to indicate that, Paragraph 7A, a foreign account in Switzerland is checked; correct?

A.      Yes.

Q.      Do you remember seeing this before you made your determination?

A.      I don't recall.

*See* Stmnt. of Facts, ¶¶ 33, 39.

It is almost impossible to believe that the individual responsible for determining that

plaintiff had failed to file an FBAR in 2007 does not recall reviewing (a) the 2007 FBAR that

plaintiff had in fact already filed; (b) plaintiff's 2007 tax return disclosing the existence of a

Swiss bank account; or (3) plaintiff's 2008 tax return again disclosing the existence of a Swiss

bank account. But the evidence adduced demonstrates just that.

**B.      There Is No Dispute That Plaintiff Meets All Four Conditions Justifying the Imposition of a Penalty That is Less Than The Maximum FBAR Penalty.**

Here, the IRS imposed the maximum penalty on plaintiff even though he meets all four

(4) of the threshold conditions which justify the imposition of a penalty that is less than the

maximum. Those conditions are: (1) the person has no history of past FBAR penalty

assessments or criminal tax or Bank Secrecy Act convictions for the preceding 10 years; (2) no

money passing through any of the foreign accounts associated with the person was from an

illegal source or used to further a criminal purpose; (3) the person cooperated during the

examination; and (4) the IRS did not sustain a civil fraud penalty against the person for an

underpayment for the year(s) in question due to the failure to report income related to any

amount in a foreign account. IRM 4.26.16.4.6.1 (7-1-08); IRM 4.26.16.4.6.2 (4-1-08).

The government witnesses responsible for conducting the investigation of plaintiff

consistently testified that plaintiff unequivocally met <u>all</u> <u>four</u> of these conditions. Agent West

testified as follows with regard to what he learned during his investigation of plaintiff:

> Q.      Agent West, I'm going to try to go by your recollection of this, which I know it's a long time ago. But during your examination of Mr. Bedrosian, you learned that he had no history of past FBAR penalty assessments, correct?
> A.      True.
> Q.      And no bank secrecy accusations, correct?
> A.      True.
> Q.      You also learned that none of the money passing through the foreign accounts was from an illegal source?
> A.      True.
> Q.      Or used for a criminal purpose?
> A.      True.
> Q.      And you found him to be completely cooperative during the examination?
> A.      We did.

Q.      And the IRS didn't sustain a civil fraud penalty against Mr. Bedrosian for underpayment, correct?
A.      I don't recollect there being a fraud being apply.
Q.      There was never any fraud –
A.      No.
Q.      -- assessment?
A.      No.

*See* Stmnt. of Facts, ¶¶ 40-43.

In fact, Agent West testified at length regarding plaintiff's extensive cooperation. When Agent West commenced his investigation, he sent plaintiff a letter requesting a comprehensive list of documents – sources of income, interest statement, contribution and charity statements, purchases and investments, and bank and brokerage statements. *See* Stmnt. of Facts, ¶¶ 14-15. In terms of plaintiff's willingness to provide the requested documents, Agent West testified as follows:

Q.      And to your recollection did he bring all of the documents that you had requested him to bring?
A.      I believe that he either had brought them there or he'd given them to us ahead of time. If my recollection serves, I think when we originally talked about, for example, the UBS info, he was having a hard time getting that from the bank. I remember that time of year I think there was like a bankers' holiday that was going on, and he so much as made the representations to me that if I have to fly to Switzerland to go get those things I'll do that. So I always found him to be very, very cooperative.

*See* Stmnt. of Facts, ¶ 18.

Agent West also confirmed that the plaintiff agreed to sign a statute of limitations extension with the IRS as part of his cooperation with the Service and went so far as to volunteer that plaintiff was "very cooperative with everything we asked for" during the exam. *See* Stmnt. of Facts, ¶ 19.

Agent Christensen also testified that plaintiff satisfied all of the conditions which justify the imposition of a penalty that is less than the maximum, but couldn't recall whether or not she even applied them:

Q.      Did Mr. Bedrosian have a history of criminal tax or BSA convictions?

A.      No.

Q.      Did he have a history of past FBAR penalty assessments?

A.      No.

Q.      ... Did you have any evidence that any of the funds that Mr. Bedrosian had in this account was from an illegal source?

A.      No.

Q.      Or was used to further a criminal purpose?

A.      No.

*     *     *

Q.      ... [D]id you have any information that Mr. Bedrosian wasn't cooperative?

A.      No.

*     *     *

Q.      ... There was no civil fraud penalty sustained in this matter, was there?

A.      No.

Q.      So actually on this little form those four threshold conditions all apply but you didn't consider that at all, did you?

A.      I don't recall.

*See* Stmnt. of Facts, ¶¶ 40-43.

In addition to Agent Christensen being unable to recall whether she even considered any of the mitigating factors, the evidence conclusively demonstrates that she never bothered to contact Agent West to discuss his experience with plaintiff as it might relate to these issues:

Q.      And Ms. Christensen, or Agent Christensen, never called you and asked you about any of your interactions with Mr. Bedrosian?

A.      No.

Q.      .... Again, you were not asked any questions about this, about Mr. Bedrosian's cooperation with you –

A.      No.

Q.      When this was made? You weren't asked about any of the other factors we discussed?

A.      No.

*See* Stmnt. of Facts, ¶ 32.

Finally, Michael Enz, the group manager overseeing this investigation, further confirmed that plaintiff met all four of the mitigation threshold conditions:

Q.    So let's talk about the mitigation threshold conditions.  There's four of them.  The first is that person has no history or criminal tax or BSA convictions for the proceeding [sic] ten years as well as no history of past FBAR penalty assessments.  Were you aware of any criminal tax or BSA conviction of Mr. Bedrosian?

A.    No.

Q.    Any history of FBAR penalty assessment?

A.    No.

Q.    The second is that no money passed through any foreign accounts associated with person from an illegal source or used it for any criminal purpose.  You didn't have any information that Mr. Bedrosian got his money –

A.    No.  No.

Q.    The third is, that the person cooperated during the examination.  Did Mr. Bedrosian cooperate?

A.    Yes.

Q.    And the fourth is, the IRS did not sustain a civil fraud penalty against the person for an underpayment for the year in question due to the failure to report income related to any amount.  Did the IRS sustain a civil fraud penalty in this case?

A.    No.

Q.    So all four of those mitigation threshold conditions were meant [sic] by Mr. Bedrosian?

A.    Correct.

Q.    Did you discuss that with Mr. Christensen?

A.    I want to say I did not.

*See* Stmnt. of Facts, ¶¶ 40-43.  Enz also testified in response to other questions about plaintiff's

level of cooperation during the interview and examination as follows:

Q.    Was he cooperative during the interview?

A.    Yes.

                    *       *       *

Q.    And your take out of this interview was that, indeed, Mr. Bedrosian was cooperative?

A.    Yes.

Q.    And that he was going to assist in the examination?

A.    Yes.

*See* Stmnt. of Facts, ¶ 42.

All three IRS representatives involved in the investigation of plaintiff testified

unequivocally that he met all four conditions justifying the imposition of a penalty that is less

than the maximum. Although not binding, the criteria in IRM 4.26.16.4.6.1 (7-1-08); IRM

4.26.16.4.6.2 (4-1-08) constitute persuasive guidance of how to evaluate these cases. *See, e.g.*

*U.S. v. Mead*, 533 U.S. 218, 234 (2001) ("agency interpretations merit some deference, whatever

its form"); *Washington State Dep't of Svcs. for the Blind v. U.S.*, 58 Fed. Cl. 781, n. 7 (2003)

("For agency 'interpretations similar to those contained in policy statements, agency manuals,

and enforcement guidelines,' however, the Supreme Court has stated that courts may treat the

agency's guidance as persuasive evidence"); *Fair Housing Rights Center in Southeastern*

*Pennsylvania v. Post Goldtex GP, LLC*, 2015 WL 171840, * 7 (E.D. Pa. 2015) (finding Fair

Housing Accessibility Guidelines to be "persuasive" agency guidance worthy of deference, even

if it's not the same degree of deference afforded to regulatory interpretations). Likewise, the

analysis and guidance regarding the willful standard (*see* pages 9-10, *supra*) is persuasive

guidance worthy of deference.

## IV.    CONCLUSION

The burden is on the defendant to show that plaintiff voluntarily and intentionally

violated a known legal duty with regard to his 2007 FBAR. The government simply cannot meet

its burden because a) plaintiff disclosed the existence of a Swiss bank account on his 2007

return; b) plaintiff timely filed a 2007 FBAR – albeit incomplete due to an unintentional

oversight; and c) plaintiff had voluntarily filed an amended FBAR disclosing both accounts prior

to the government's examination. Additionally, plaintiff overwhelmingly satisfies the criteria

that justify a lesser penalty. There is no genuine dispute as to any material fact and plaintiff is

entitled to judgment as a matter of law.

Respectfully submitted,


    /s/ Patrick J. Egan
Patrick J. Egan, Esquire
Beth L. Weisser, Esquire
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
(215) 299-2000 (telephone)
(215) 299-2150 (fax)


*Attorneys for Plaintiff Arthur Bedrosian*

Date: December 5, 2016

**CERTIFICATE OF SERVICE**

I, Beth L. Weisser, hereby certify that the foregoing Motion for Summary Judgment was

served by ECF, upon the following:

Katherine M. Reinhart, Esquire
Kavitha Bondada, Esquire
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 227
Washington, D.C. 20044
Katherine.Reinhart@usdoj.gov
Kavitha.Bondada@usdoj.gov


Beth L. Weisser


Date:    December 5, 2016