IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ARTHUR BEDROSIAN | CIVIL ACTION |
|---|---|
| v. | NO. 15-5853 |
| THE UNITED STATES OF AMERICA, DEPARTMENT OF THE TREASURY, INTERNAL REVENUE SERVICE | |

**Baylson, J.** April 13, 2017

## MEMORANDUM RE CROSS MOTIONS FOR SUMMARY JUDGMENT

In this tax penalty action, we must determine whether genuine disputes of material fact preclude summary judgment on behalf of Plaintiff, Arthur Bedrosian, or Defendant, the United States. Bedrosian initiated this suit, alleging that the United States committed illegal exaction by imposing an unwarranted tax penalty on him. The United States countersued for full payment of the penalty it had assessed. For the reasons discussed below, we deny summary judgment for both parties.

**I. UNDISPUTED FACTS**

The following is a fair account of the factual assertions at issue in this case, as taken from both parties Statements of Fact and not genuinely disputed. Bedrosian is a United States citizen who has had, over the past several decades, a successful career in the pharmaceutical industry. ECF No. 22, Def.'s Mot. for Summary Judgment ("Def.'s Mot."), Def.'s Statement of Facts ("DSOF") ¶¶ 1, 3. He currently holds the position of Chief Executive Officer at Lannett Company, Inc., a manufacturer and distributor of generic medications. Id., DSOF ¶¶ 6, 10. In this role, Bedrosian supervises approximately 100 employees, signs contracts and financial statements on behalf of Lannett, researches FDA regulations, and decides company policy with respect to FDA filings. Id., DSOF ¶¶ 9-10.

1

Bedrosian opened a savings account with Swiss Credit Corporation in Switzerland in the early 1970s, which account was transitioned to UBS when UBS acquired Swiss Credit Corporation. Id., DSOF ¶¶ 11-12. At some point, at least as early as 2005, a second account was added, although Bedrosian avers that he always considered them one account. Id., DSOF ¶ 14; ECF No. 26, Pl.'s Opp'n, Ex. A (Pl.'s Dep. Tr.) at 132:9-133:15. The client numbers for each account ended in 6167 and 5316. Def.'s Mot., DSOF ¶ 15. The parties dispute the extent of Bedrosian's involvement in the management of his UBS accounts, but it is at least clear that Bedrosian met with a UBS banker about once a year to review the accounts' performance. Id., DSOF ¶ 18; Pl.'s Opp'n, Ex. A at 58:6-21, 115:3-22. During 2007, the tax year at issue in this proceeding, both UBS accounts carried balances of significantly more than $10,000. Def.'s Mot., DSOF ¶ 19. In November 2008, Bedrosian requested that UBS close his account ending in 6167 and transfer all assets therein to another Swiss bank. Id., DSOF ¶ 20. The following month, he requested that UBS close his account ending in 5316 and transfer all assets therein to a domestic account at Wachovia. Id., DSOF ¶ 21.

Throughout the decades that Bedrosian maintained the Swiss accounts, he did not prepare his own tax returns; rather, two accountants did so – Seymour Handleman from 1972 until 2006, and Sheldon Bransky from 2007 onwards. Id., DSOF ¶¶ 22-23, 31. Bedrosian did not inform Handleman of the UBS accounts' existence until the 1990s, because, Bedrosian avers, "[Handleman] never asked." Id., Ex. S (Pl.'s Dep. Tr.) at 67:1-5. When Bedrosian did tell Handleman, the accountant said that "for the past 20 years, [Bedrosian had] been breaking the law" because he was "supposed to be marking [his] return that [he has] a foreign bank account and [he had not] been doing that." Id., Ex. S at 67:7-16. But, in response to Bedrosian asking what he should do to rectify the problem, Handleman allegedly told him "to just leave it alone

2

because the damage was already done" and that, upon Bedrosian's death, the assets in the Swiss accounts would be repatriated as part of Bedrosian's estate and taxes would be paid on them then. Id., Ex. S at 69:18-24. Based on that advice, as well as his fear that he would be penalized for his years of noncompliance, Bedrosian did not report either Swiss account on his tax returns until 2007, when Handleman died and Bedrosian hired Bransky to take over his accounting work. Id., Ex. S at 72:1-5, 203:11-21.

Bedrosian filed a federal income tax return for 2007 that reflected, for the first time, that he had assets in a foreign financial account in Switzerland. Id., DSOF ¶ 34. Specifically, on Schedule B of his return, Bedrosian answered "yes" to question 7a asking whether "[a]t any time during 2007, [he had] an interest in or signature or other authority over a financial account in a foreign country," and listed Switzerland as the foreign country in which the account was located. Id., Ex. N (Pl.'s 2007 Return and FBAR). Bedrosian also filed a Report of Foreign Bank and Financial Accounts, commonly referred to as an "FBAR," for the first time in 2007. Id., DSOF ¶ 38, Ex. N. But, critically, he only reported the existence of his Swiss account ending in 5316, which had assets totaling approximately $240,000, and did not report the account ending in 6167, which had assets totaling approximately $2.3 million. Id., DSOF ¶ 38, Ex. N. Bedrosian did not report any of the income that he earned on either Swiss account on his 2007 return. Id., DSOF ¶ 35.

Sometime after 2008, UBS told Bedrosian that it would be providing his account information to the United States government. Id., DSOF ¶ 41. Around this time, prior to the government's initiation of its investigation, Bedrosian hired an attorney to look into his reporting obligations as they pertained to the Swiss accounts. Id., Ex. S at 85:11-24, 184:11-185:23. In August 2010, Bedrosian filed an amended federal return for 2007 on which he reported the

approximately $220,000 of income he had earned from the Swiss accounts. Id., DSOF ¶ 43, Ex. P (Pl.'s Amended 2007 Return). He also filed an amended FBAR for 2007 in August 2010, on which he reported both UBS accounts rather than just the one ending in 6167. Pl.'s Mot., PSOF ¶ 13, Ex. D (Pl.'s Amended 2007 FBAR). Although Bedrosian took this corrective action before the government began its audit, he did not do so until after the IRS had discovered the existence of the two accounts. Id., PSOF ¶ 38; Def.'s Mot., Ex. Q (IRS Memo) (stating that UBS supplied the IRS with information about the existence of the account ending in 6167 on July 19, 2010).

The IRS initiated its investigation of Bedrosian in April 2011, with a focus on tax year 2008. Pl.'s Mot., PSOF ¶ 14. Beginning then, Bedrosian engaged with the Service cooperatively, providing them with all documentation requested. Id., PSOF ¶¶ 17-19. The investigation culminated in a case panel of IRS agents recommending that Bedrosian be penalized for non-willful violations of the FBAR reporting requirement and that the case against him be closed. Id., PSOF ¶ 27, Ex. F (John West Dep. Tr.) at 51:10-16. For reasons unclear in the record, the case was not closed but instead was re-assigned to another IRS agent, Pamela Christensen, who conducted her own review and concluded that Bedrosian's violation of Section 5314 had been willful. Id., PSOF ¶¶ 29-30, Ex. G (Pamela Christensen Dep. Tr.) at 17:8-15, 21:18-21. On July 18, 2013, the IRS sent Bedrosian a letter stating that it was imposing a penalty for his willful failure to file TDF 90-22.1, the FBAR form, for tax year 2007. Id., PSOF ¶ 35, Ex. I (Letter from IRS). The proposed penalty was $975,789.17, 50% of the maximum value of the account ($1,951,578.34) and therefore the largest penalty possible under the regulations. Id., PSOF ¶ 36, Ex. I.

## II. PROCEDURAL BACKGROUND

4

Bedrosian filed suit on October 27, 2015, alleging one count of illegal exaction (ECF No. 1). The United States answered on February 26, 2016 and asserted a counterclaim for full payment of the penalty it alleged was due, as well as accrued interest on such penalty, a late payment penalty, and other statutory additions to the penalty (ECF No. 5). Bedrosian filed an answer to the counterclaim on March 21, 2016 (ECF No. 7). Both parties then moved for summary judgment, the United States on November 30, 2016 (ECF No. 22) and Bedrosian on December 5, 2016 (ECF No. 25). Oppositions were filed on December 19, 2016 (ECF Nos. 26, 27) and the United States replied on December 23, 2016 (ECF No. 28).

### III. LEGAL STANDARD

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must, "by citing to particular parts of materials in the record" set out specific facts showing a genuine issue for trial.

Fed. R. Civ. P. 56(c)(1)(A).  "Speculation and conclusory allegations do not satisfy [the non-moving party's] duty."  Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999) (superseded by statute on other grounds as recognized by P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 730 (3d Cir. 2009)).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Id.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

IV. **DISCUSSION**

### A. Statutory Framework

Under Section 5314(a) and its corresponding regulations, United States citizens must report on an annual basis to the IRS any "financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country."  31 C.F.R. § 1010.350(a); 31 U.S.C. § 5314(a).  The required form is the FBAR (TDF 90-22.1).  31 C.F.R. § 1010.350(a); 31 U.S.C. § 5314(a).  Failure to timely file an FBAR for each foreign financial account in which a taxpayer has an interest of over $10,000 results in exposure to a civil money penalty that varies depending on the taxpayer's level of culpability.  31 C.F.R. § 1010.306(c); 31 U.S.C. § 5321(a)(5).  Specifically, non-willful violations of the FBAR reporting requirement result in a penalty not to exceed $10,000, whereas willful violations can lead to a penalty that is the greater of $100,000 or fifty percent of the balance in the account at the time of the violation. 31 U.S.C. § 5321(a)(5)(B)(i), (a)(5)(C).  A "reasonable cause" exception exists for non-willful violations, but not for willful ones.  31 U.S.C. § 5321(a)(5)(C)(ii).

### B. Willfulness of Bedrosian's Violation of Section 5314

The crux of this case is Bedrosian's level of culpability in failing to file an FBAR for one of his two Swiss bank accounts in 2007; that is, did he act willfully under the pertinent statute and regulations, or non-willfully? The parties do not dispute that Bedrosian meets the other requirements of the relevant laws – (1) he is a citizen of the United States, (2) he had an interest in a financial account during 2007, (3) the account had a balance that exceeded $10,000 during 2007, (4) the account was in a foreign country, and (5) Bedrosian failed to disclose the account. See 31 C.F.R. § 1010.350; 31 U.S.C. § 5314. Therefore, the only issue in dispute is whether Bedrosian's violation of Section 5314 was willful.

We start from the premise that the precise contours of the term "willful" as used in Section 5321, the civil penalty provision, have not been clearly established by statute or precedent. Authorities ranging from various federal courts, the Internal Revenue Manual, and the Office of Chief Counsel for the Internal Revenue Service reach different conclusions about the level of intent necessary to satisfy the willfulness requirement. To ground our discussion, we will summarize the approach taken by the only three federal courts to have engaged in this analysis thoroughly. See United States v. Williams, 489 F. App'x 655 (4th Cir. 2012); United States v. Bohanec, No. 15-4347, 2016 WL 7167860 (C.D. Cal. Dec. 8, 2016); United States v. McBride, 908 F. Supp. 2d 1186 (D. Utah 2012).

Williams, Bohanec, and McBride all stand for the proposition that a defendant has willfully violated Section 5321 not only when he knowingly violates the rule but also when he recklessly does so. See Williams, 489 F. App'x at 660; Bohanec, 2016 WL 7167860, at *5; McBride, 908 F. Supp. 2d at 1204. Those holdings are grounded on the Supreme Court's decision in Safeco Ins. Co. of America v. Burr, 551 U.S. 47 (2007), where the Court discussed how to determine civil liability for "willfully fail[ing] to comply" with the Fair Credit Reporting

7

Act ("FCRA"). Id. at 57 (alteration in original). The Court there began by characterizing "willfully" as a "word of many meanings whose construction is often dependent on the context in which it appears." Id. (internal quotations omitted) (quoting Bryan v. United States, 524 U.S. 184, 191 (1998)). Importantly, it then stated that, "where willfulness is a statutory condition of civil liability, [the Court has] generally taken it to cover not only knowing violations of a standard, but reckless ones as well." Id. (collecting cases in which the Court so defined the term in the context of civil statutes). Consistent with that trend, the Court concluded that the FCRA's requisite willful intent was satisfied by a finding that the defendant recklessly violated the statute. Id. at 57-58.

Bedrosian does not reference Safeco in his motion or opposition to the United States' motion; rather, he relies on two Supreme Court cases that examine willfulness in the criminal tax penalty context to advocate for an identical definition in the civil one. He cites Cheek v. United States, 498 U.S. 192 (1991) and Ratzlaf v. United States, 510 U.S. 135 (1994), for the proposition that "[i]n order to sustain a 'willful' penalty under 31 U.S.C. § 5321(a)(5), the government must show that [P]laintiff's actions amount to a 'voluntary, intentional violation of a known legal duty.'" Pl.'s Mot. at 5 (quoting Cheek, 498 U.S. at 201). As noted, these cases arise in the criminal context, and we are highly skeptical that the Court's reasoning therein will be applicable in the instant case. Certain dicta in Safeco discussing the distinction between the civil and criminal contexts in terms of the willfulness standard compel that conclusion. Specifically, the Court in Safeco emphasized the importance of "limiting [criminal] liability to knowing violations" because, in order to harbor the requisite criminal intent, a defendant must "act[] with knowledge that his conduct was unlawful." Safeco, 551 U.S. at 57 n.9 (quoting Bryan, 524 U.S. at 193). It then stated "[c]ivil use of the term, however, typically presents

neither the textual nor the substantive reasons for pegging the threshold of liability at knowledge of wrongdoing," and concluded that "[t]he standard civil usage . . . counsels reading the phrase" to include reckless violations." Id. at 57, 57 n.9.

At this juncture, we need not hold what the appropriate standard of willfulness is, but we note that the jurisprudential trend is towards one that would encompass reckless violations of Section 5314. Regardless, the key question here is whether either party has pointed to a lack of genuine dispute of material fact on their affirmative claims. We answer that in the negative. The determinative issue for both Bedrosian's illegal exaction claim and the United States' claim for payment of the proposed penalty is Bedrosian's intent. Whether Bedrosian willfully failed to submit an accurate FBAR for 2007 is an inherently factual question and one that cannot be resolved at this stage. Genuine disputes exist as to what Bedrosian knew regarding his reporting requirements, and when, especially as those issues relate to his relationship with his accountant, Seymour Handleman. Although there is no good cause exception for willful violations of Section 5314, we nevertheless find that Bedrosian's testimony regarding the information provided to him by Handleman and what exactly Bedrosian did with that information, if anything, would be relevant to a determination of Bedrosian's intent. For those reasons, summary judgment is not warranted as to either party.

V. CONCLUSION

For the foregoing reasons, both Bedrosian's Motion for Summary Judgment (ECF No. 25) and the United States' Motion for Summary Judgment (ECF No. 22) are denied.