IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ARTHUR BEDROSIAN,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>Defendants. | Case No. 2:15-cv-05853 |

## PLAINTIFF ARTHUR BEDROSIAN'S TRIAL MEMORANDUM

Plaintiff Arthur Bedrosian, by and through his undersigned counsel, respectfully submits this trial brief pursuant to L.R. 16.1(c) and the Court's Pretrial and Trial Procedures.

## I. INTRODUCTION

Plaintiff seeks return of a $9,757.89 payment made to Defendants in partial payment of a willful FBAR penalty of $1,007,345.48 and judgment in his favor on the defendants' counterclaims. The penalty is for the 2007 tax year. Plaintiff is entitled to relief because he did not willfully fail to file an FBAR for 2007. Indeed, Plaintiff indicated that he had a foreign account on his 2007 Form 1040 and filed an FBAR in tax year 2007 that correctly stated that he had assets in an account in Switzerland and identified the institution where those assets were deposited. The defendants' position that because the information on the return and FBAR form was incomplete, Plaintiff acted willfully is inconsistent with the facts and well established precedent.

Plaintiff's actions do not rise anywhere near the level of behavior determined by existing precedent to be willful. All of the money deposited in his account was from after tax income. He did not use shell companies or tax avoidance schemes to secrete the funds. Plaintiff correctly identified the institution where the funds were held on his 2007 return. He engaged experienced

tax counsel and a recommended forensic accountant to insure that his returns and FBAR forms were complete and accurate prior to any knowledge of an IRS inquiry regarding his overseas account. He cooperated fully with the IRS when it audited his returns. This conduct is entirely inconsistent with a finding of willfulness.

## II. NATURE OF THE ACTION

Plaintiff asserts a claim for illegal exaction arising from the defendants' imposition of a willful FBAR penalty and the sustaining of such penalty after plaintiff's protest. *See* Complaint, Doc. No. 1. On February 26, 2016, the IRS filed an Answer and Counterclaim, seeking the balance of the penalty assessed plus interest and other penalties for a total of $1,007,345.48 plus statutory additions. *See* Doc. No. 5. This Court has jurisdiction pursuant to 28 U.S.C. § 1346(a).

## III. STATEMENT OF THE FACTS

Plaintiff is an executive officer in the generic pharmaceutical industry who has been working and paying taxes since the age of 17. Up until approximately 1970, plaintiff prepared his own tax returns. During the 1970's, plaintiff frequently travelled overseas for business. At some point during those travels, he opened a simple savings account with Swiss Credit Corporation ("the Bank") by depositing $100.00. When he opened the account, he was not yet an executive and was required to travel abroad frequently. He opened the account in order to simplify his travels by using a local bank recognized throughout Europe instead of relying on travelers' checks, as was customary at the time. Union Bank of Switzerland ("UBS") later acquired the Bank. Over the years, Plaintiff made occasional after tax deposits with UBS by regular check or wired funds from one of his US checking accounts. In the early 2000s, UBS proposed a loan to Plaintiff of 750,000 Swiss Francs (approximately $780,000.00 ) at a 1.75% interest rate, which would be collateralized by the existing account. The Bank sold this loan as a

2

"no lose" proposition. The income from the investment would theoretically pay the interest on the loan. Plaintiff accepted this offer. The loan was set up as a subaccount under the existing account. Plaintiff always considered them to be one account. Similarly, he viewed the amount of the loan as an offset of the funds in the account.

At some point during the 1990s, plaintiff told his then accountant – Seymour Handelman ("Handelman") – about the foreign account. Handelman informed Plaintiff that he should have been reporting the foreign account on his taxes but, significantly, told plaintiff to leave the account as it was and that he (or his estate) would pay taxes on the money in the account when repatriated. Plaintiff followed the instructions of his long time account and assumed he would pay taxes on the money in the future.

Handelman passed away in 2007. Plaintiff then engaged Sheldon Bransky ("Bransky"), who had previously worked with Handelman from time to time, to prepare his tax returns. It was Plaintiff's custom to collect relevant financial documents during the year and forward them to his accountant to prepare his returns. When Bransky prepared plaintiff's 2007 return he included the following information on Schedule B: (i) that Plaintiff had an overseas account and (ii) that the foreign account was in Switzerland. Bransky also prepared and filed an FBAR on Plaintiff's behalf for calendar year 2007. The original 2007 FBAR inadvertently omitted one of plaintiff's two accounts – although plaintiff always viewed it as one account with a subaccount. The second account, or subaccount, was maintained at the same bank as the account identified on plaintiff's 2007 FBAR.

In approximately 2009, plaintiff began to question whether he could simply pay taxes on the money in the foreign account when it was repatriated, as he had previously been advised. He approached his attorney to discuss how to proceed and the law firm engaged a forensic

3

accountant, Stewart Farber, to prepare amended returns and to file the appropriate FBAR reports. Around the same time, on the advice of counsel, Plaintiff also engaged Swiss counsel to obtain all of his bank records from UBS. Swiss counsel advised Plaintiff that his account information was provided to the IRS by UBS. Significantly, Plaintiff had already decided to file amended returns and FBAR forms when he learned this fact. In August 2010, plaintiff filed FBAR reports for 2006, 2007 and 2008. In October 2010 he filed an FBAR report for 2009.

In April 2011, the IRS advised plaintiff that his 2007 and 2008 tax returns had been selected for examination. Accompanying that letter was an Information Document Request ("IDR"), seeking certain items from the plaintiff, such as sources of taxable and non-taxable interest (both foreign and domestic), substantiation for all cash contributions, documents detailing the purchase date and price of investments during that tax year, and statements from banks, brokerages, etc. Plaintiff provided all of the documentation requested by IRS.

In October 2011, plaintiff and his representative met with IRS Revenue Agent John West and Group Manager Michael Enz. According to Agent West, plaintiff was "very, very cooperative" during the interview. From that point until November 2012, Agent West continued his examination of plaintiff. During his investigation, Agent West requested and received plaintiff's FBAR reports for 2006-2009. Agent West testified that he took all of those filed FBARs into account when determining how to proceed with this matter. Agent West ultimately determined, based on the totality of his investigation, that plaintiff's violation of the FBAR requirements was non-willful. In September 2012, Agent West and the Group Manager Enz met with the treaty case panel to review plaintiff's case. The treaty case panel – consisting of subject matter experts on offshore issues, including counsel – recommended that plaintiff's case be closed with non-willful violations, thereby substantiating Agent West's conclusions.

4

Shortly after Agent West and Group Manager Enz met with the treaty panel, Agent West went out on an unexpected medical leave for approximately four months. When he departed, plaintiff's case was reassigned to Agent Pamela Christensen for closure. However, Agent Christensen did not close the case. Almost immediately upon receiving the file, Agent Christensen decided that the penalty proposed by Agent West was not correct, even though Agent West had conducted approximately 18 months of investigation, interviewed the plaintiff, reviewed his filings thoroughly and made a determination that was consistent with the recommendation of the offshore subject matter experts on the treaty case panel. Conversely, Agent Christensen ignored this investigation and relied on information that was clearly contradicted to support her pre-determined outcome. Agent Christensen never spoke with Mr. Bedrosian, nor did she speak with Agent West about his lengthy investigation. Shockingly, Agent Christensen was not even aware that Plaintiff had in fact reported a foreign account on his 2007 form 1040 and filed an FBAR for 2007 in 2008.

On or about July 18, 2013 the IRS imposed upon the plaintiff a willful penalty for failure to file TDF 90-22.1. The maximum value of the account was $1,951,578.34 and the amount of the penalty was $975,789.17 – half the value of the account, and the highest penalty that could be imposed. Plaintiff submitted a written protest of the determination, which was denied. On August 26, 2015, plaintiff made a partial payment of the FBAR penalty to the Department of the Treasury in the amount of $9,757.89.

## IV. <u>ARGUMENT</u>

In his motion for summary judgment, plaintiff argued that the appropriate standard of willfulness is a "voluntary, intentional violation of a known legal duty" as enunciated in *Cheek v. United States*, 498 U.S. 192 (1991). In denying plaintiff's motion, the Court indicated that it is

inclined to adopt the definition of willfulness enunciated in recent civil FBAR cases. This case stands in stark contrast to those decisions finding a willful violation, which were based on egregious, purposeful, and at times criminal conduct. Even under that standard, plaintiff's actions were not willful.

### *Williams*

In *U.S. v. Williams*, 489 Fed.Appx. 655 (4th Cir. 2012), Williams opened two Swiss bank accounts in the name of ALQI Holdings, Ltd., a British corporation. *Id.* at 656. From 1993 until 2000, Williams deposited more than $7,000,000 into the ALQI accounts but did not report the income from those accounts to the IRS. *Id.* In the fall of 2000, Swiss and US authorities were aware of the assets in these accounts. Williams retained counsel and met with Swiss authorities in November 2000 and, the following day, the Swiss authorities froze Williams' ALQI accounts. *Id.*

In January 2001, after meeting with Swiss and US authorities regarding these accounts, Williams completed a "tax organizer" from his accountant to aid in the preparation of his 2000 return. *Id.* In response to a question in the organizer regarding whether he had a bank account or financial account in a foreign country, he said "no". Williams also checked "no" in response to this question on Schedule B of his 2000 return and failed to file an FBAR. *Id.* at 657. Later, upon the advice of counsel, Williams fully disclosed the accounts to the IRS in January 2002 and, in October of the same year, filed his 2001 federal tax return identifying the interest in these accounts. He also disclosed these accounts to the IRS in February 2003 when applying to participate in the Offshore Voluntary Compliance Initiative, and filed amended returns for 1999 and 2000. *Id.*

In June 2003, Williams pled guilty to a two-count superseding criminal information charging him with conspiracy to defraud the IRS and criminal tax evasion, all in connection with the funds held in the ALQI accounts. *Id.* As part of that guilty plea, "Williams agreed to allocute to all of the essential elements of the charged crimes, including that he unlawfully, willfully, and knowingly evaded taxes by filing false and fraudulent tax returns on which he failed to disclose his interest in the ALQI accounts." *Id.* In January 2007, Williams finally filed an FBAR for each of the tax years from 1993 through 2000. *Id.* The district court found this to be a non-willful violation but the Fourth Circuit reversed, finding it to be willful based in large part on Williams' guilty plea allocution. *Id.* at 660.

### *McBride*

In *U.S. v. McBride*, 908 F.Supp.2d 1186 (D. Utah 2012), the government brought an action seeking to enforce a civil penalty it had assessed against the taxpayer based on his failure to report his interest in four foreign bank accounts. 908 F.Supp.2d at 1188. McBride was responsible for financial operations of The Clip Company and, in anticipation of an increase in revenue for the company, sought a way to reduce or defer the income taxes that would normally have been paid. *Id.* at 1189. McBride sought the assistance of Merrill Scott and Associates, a financial management firm who strategies "were designed to allow its clients to avoid reporting income and their ownership of assets by having the clients' assets held by nominees holding the legal title of shell corporations and foreign bank accounts." *Id.* Pursuant to the plan proposed by Merrill Scott, Merrill Scott formed or made available to McBride three "International Business Corporations ("IBCs") – Drehpunkt, Ltd. ("Drehpunkt"), Lombard & Associations ("Lombard"), and Palisades & Associates ("Palisades"). *Id.* at 1192. These IBCS were nominally controlled by individuals who were employed by or associated with Merrill Scott. *Id.* Each of these

7

entities then opened separate bank accounts at the Royal Bank of Scotland, in the Bahamas. McBride, through the Clip Company, also entered into an agreement with a Taiwanese manufacturer whereby a deliberate overpayment (referred to as "excess funds") by the manufacturer would be sent by wire transfer to the Bahamian account of one of the IBCs. *Id.* The "excess funds" were then transferred back to McBride and/or The Clip Company through a pretextual "loan" arrangement to the Clip Company whereby funds were transferred from one of the IBCs to another foreign company controlled by Merrill Scott which then made a "loan" to the Clip Company in the form of a "sham" line of credit. *Id.* at 1194. Once the untaxed funds were repatriated, they were used for many different purposes including distributions in the form of "partner draws" to McBride, mortgage payments for his former wife, airline travel, and automobile leases, among many other things. *Id.* at 1195.

During 200 and 2001, approximately $2.7 million of otherwise taxable profits of the Clip Company were routed to McBride. For the year 2000, in response to the question about the existence of foreign accounts on Schedule B of McBride's 1040, he responded "no." *Id.* at 1198. He also did not file an FBAR for 2000. *Id.* Once the IRS began investigating McBride, he refused to provide documents to the revenue agent, lied during the examination, and refused to complete and submit FBARs for 2000 and 2001. *Id.* at 1200. The district court found that McBride had willfully violated the statute through this convoluted and purposeful tax evasion scheme.

### *Bohanec*

In *U.S. v. Bohanec*, 2016 WL 7167860 (C.D. Cal. Dec. 8, 2016), the defendants owned a camera shop in California and deposited commissions from international sales into an account at UBS AG in Switzerland. 2016 WL 7167860, at *1-2. The Bohanecs also directed certain other

8

ACTIVE\50513339.v1-8/28/17

customers to deposit money directly into the Swiss UBS account. *Id.* at *2. In addition to the Swiss bank account, the Bohanecs maintained bank accounts in Austria and Mexico. *Id.* Between the filing of their 1998 federal income tax return and May 19, 2011, the Bohanecs failed to file *any* federal income tax returns. *Id.* at *4. Between the opening of the UBS account in the early 1980's and May 19, 2011, the Bohanecs failed to file any FBARs. *Id.*

The Bohanecs eventually applied for the Voluntary Disclosure Program for Offshore Accounts. *Id.* On May 19, 2011, they executed and filed FBARs and federal income tax returns for 2003-2008. *Id.* Those FBARs included the Bohanecs' Swiss bank account but failed to include the Austrian bank account (which was in existence from 2003-2008) and the Mexican bank account (which was in existence from 2006-2008). *Id.* The tax returns filed in 2011 also failed to include certain income. *Id.* The Bohanecs were ultimately rejected by the IRS from the Voluntary Disclosure Program and the IRS issued a notice of deficiency for tax years 2003 – 2010. The court in *Bohanec* noted that the defendants never told anyone – such as their tax preparer, a lawyer, or an accountant – about the UBS account. *Id.* at *6. The court found a willful violation, and noted that the defendants' credibility was further undermined by their misrepresentations related to their application for the Voluntary Disclosure Program. *Id.*

Finally, the Internal Revenue Manual, while not binding precedent on this Court, provides the following hypothetical to help elucidate the willfulness standard:

> A person files the FBAR, but omits one of three foreign bank accounts. The person had previously closed the omitted account at the time of filing the FBAR The person explains that the omission was due to unintentional oversight. During the examination, the person provides all information requested with respect to the omitted account. The information provided does not disclose anything suspicious about the account, and the person reported all income associated with the account on his tax return. The penalty for a willful violation should not apply absent other evidence that may indicate willfulness.

9

IRM 4.26.16.6.5.1 (11-06-2015). This hypothetical – in the Internal Revenue Manual bears striking similarities to Plaintiff's situation.

The conduct of Plaintiff stands in In contrast to the defendants in *Williams, McBride, and Bohanec*:

- On plaintiff's 2007 tax return he answered **YES** in response to the question of "[a]t any time during 2007, did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?"
- In response to the follow-up question of "If 'yes,' enter the name of the foreign country," plaintiff responded "Switzerland."
- Plaintiff provided the same "yes" responses on his 2008 return.
- In October 2008, plaintiff filed an FBAR for calendar year 2007, listing one account with a value between $100,000 and $1,000,000.00.
- Before the government had even commenced its investigation, plaintiff had filed FBARs for years 2006-2009.
- Plaintiff was cooperative, forthcoming, and honest with the IRS during the course of its investigation.

These actions are entirely inconsistent with the actions of the taxpayers in *Williams, McBride* and *Bohanec* and justify a different result.

## V. DAMAGES

Plaintiff has sustained damages in the amount of $9.757.89 and is entitled to a refund of that amount. Plaintiff owes nothing further because the amount sought is an illegal exaction.

10

ACTIVE\50513339.v1-8/28/17

Furthermore, the defendant's counterclaim for the balance of the amount due should be denied because this was not a willful violation of the statute.

## VI. WITNESSES

Plaintiff anticipates calling the following witnesses (either live or through the use of deposition testimony) during his case in chief: Arthur Bedrosian, Pamela Christensen, John West, Michael Enz, and Sheldon Bransky.

## VII. EXHIBITS

Plaintiff's potential trial exhibit list is attached hereto as Exhibit A.

## VIII. DAYS FOR TRIAL

Plaintiff estimates 2 days for trial.

Respectfully submitted,

/s/ Patrick J. Egan
Patrick J. Egan, Esquire
Beth L. Weisser, Esquire
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
(215) 299-2000 (telephone)
(215) 299-2150 (fax)

*Attorneys for Plaintiff Arthur Bedrosian*

Date: August 28, 2017

# Exhibit A

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

ARTHUR BEDROSIAN, )
)
    Plaintiff, ) Case No. 2:15-cv-05853
)
v. )
)
UNITED STATES OF AMERICA, et al., )
)
    Defendants. )
_____ )

## Plaintiff's Trial Exhibits

| EX. | DESCRIPTION | DOC. DATE | BATES |
|---|---|---|---|
| P-1 | Report of Foreign Bank and Financial Accounts TD F 90-22.1 - 2007 | N/A | US0136 |
| P-2 | Report of Foreign Bank and Financial Accounts TD F 90-22.1 - 2003 | N/A | US0246-247 |
| P-3 | UBS Signature Cards | Various | US0160-0162 |
| P-4 | Account Statement Information Spreadsheet | Various | P-002359-388 |
| P-5 | Section 3.2 Contacts | Various | P-002352<br><br>P-002354<br><br>P-002356<br><br>P-002358 |
| P-6 | Letter from UBS to Bedrosian dated 11/19/86 re: Confirmation of opening of safekeeping account | 11/19/86 | P-002389 |
| P-7 | Letter from UBS to Bedrosian dated 10/21/91 | 10/21/91 | P-002390 |
| P-8 | Letter from UBS to Pharmeral dated 1/21/92 re: Management Account No. 529.723.S1 – Management Agreement | 1/21/92 | P-002393 |

1

| EX. | DESCRIPTION | DOC. DATE | BATES |
|---|---|---|---|
| P-9 | Declaration for Mail Held by the Bank | 7/5/93 | P-002321 |
| P-10 | UBS Note to File re: Transfer of Relationship into a Discretionary Asset Management Relationship | 2/16/02 | P-002320 |
| P-11 | UBS Wealth Management: Risk Compass. The Questionnaire | 7/4/03 | P-002282-2288 |
| P-12 | Email from Bedrosian to Gisler dated 8/26/03 re: Alternative Investments | 8/26/03 | P-002292 |
| P-13 | Bedrosian UBS Asset Management Agreement dated 10/6/04. Master No. 0230-236.167 | 10/6/04 | P-002332-2336 |
| P-14 | UBS Correspondence Instructions | 10/6/04 | P-002307 |
| P-15 | Bedrosian UBS Asset Management Agreement dated 9/4/05. 0230.236167 | 9/4/05 | P-002337-2341 |
| P-16 | Lending Proposal | 9/22/05 | P-002294-2295 |
| P-17 | UBS Statement of Assets as of 12/31/05 | 12/31/05 | P-002234 P-002248 |
| P-18 | Letter from UBS to Bedrosian dated 1/2/06 re: Statement of Assets for you portfolio 0230-236 167-01 as of 12/31/2005 | 1/2/06 | P-002689 |
| P-19 | Bedrosian 2008 Tax Return 1040 | | |
| P-20 | Bedrosian 2008 Schedule B (Form 1040) page 2 | 1/1/08 | US0043 |
| P-21 | Bedrosian Amended 2008 Tax Return 1040X | | P-000214-232 |
| P-22 | Bedrosian 2007 Tax Return 1040 | 10/14/08 | US0008-011 |
| P-23 | Bedrosian Amended 2007 Tax Return 1040X | | FARBER 000000191-205 |
| P-24 | Report of Foreign Bank and Financial Accounts TD F 90-22.1 - 2007 | 10/14/08 | US0243 |
| P-25 | Handwritten Note with Arthur P. Bedrosian's signature | 11/5/08 | US0177 |

| EX. | DESCRIPTION | DOC. DATE | BATES |
|---|---|---|---|
| P-26 | Letter to Salvisberg dated 11/28/08 | 11/28/08 | P-002303-2304 |
| P-27 | Fax to Salvisberg UBS from Bedrosian dated 12/2/08 re: Closing of account 206 355 316 | 12/2/08 | P-002392 |
| P-28 | Report of Foreign Bank and Financial Accounts TD F 90-22.1 – 2008 | 10/9/09 | US0244 |
| P-29 | Letter from UBS to Dr. Christian Meyer | 12/7/09 | |
| P-30 | Report of Foreign Bank and Financial Accounts TD F 90-22.1 – No year on document | 6/28/10 | US0245 |
| P-31 | Report of Foreign Bank and Financial Accounts TD F 90-22.1 - 2006 | 8/12/10 | US0250-251 |
| P-32 | Letter to Bedrosian from Farber dated 8/12/10 attaching 2006 Tax Returns | 8/12/10 | SFARBER-000287-324 |
| P-33 | Report of Foreign Bank and Financial Accounts TD F 90-22.1 - 2007 | 8/13/10 | US0252-253 |
| P-34 | Report of Foreign Bank and Financial Accounts TD F 90-22.1 - 2004 | 8/20/10 | US0254-255 |
| P-35 | Report of Foreign Bank and Financial Accounts TD F 90-22.1 - 2005 | 8/20/10 | US0248-249 |
| P-36 | Letter from Arthur Bedrosian to Internal Revenue Service | 9/9/10 | US0045-0048 |
| P-37 | Report of Foreign Bank and Financial Accounts TD F 90-22.1 2007-2010 | 10/1/10 | US0126-137 |
| P-38 | Report of Foreign Bank and Financial Accounts TD F 90-22.1 - 2008 | 10/1/10 | US0258-259 |
| P-39 | Report of Foreign Bank and Financial Accounts TD F 90-22.1 2009 | 10/4/10 | US0256-257 |
| P-40 | Examining Officer's Activity Record | 3/21/11 | P-000022-024 |
| P-41 | Examining Officer's Activity Record | 3/21/11 | P-000269-275 |
| P-42 | Initial Contact Letter from IRS dated 4/25/11 attaching Information Document Request | 4/25/11 | US0056-057 |

| EX. | DESCRIPTION | DOC. DATE | BATES |
|---|---|---|---|
| P-43 | Report of Foreign Bank and Financial Accounts TD F 90-22.1 - 2010 | 5/31/11 | US0260 |
| P-44 | Letter from West to Bedrosian dated 8/30/11 confirming appointment. | 8/30/11 | US0058-059 |
| P-45 | Interview – Form 1040 dated 10/4/11 | 10/4/11 | P-000186-188 |
| P-46 | Revenue Agent Audit Plan | 10/4/11 | P-00278-280 |
| P-47 | FBAR Penalties; Post 10/22/04; Non-BSA Examines Lead Sheet (Tax Year 2008) | 3/27/12 | P-000081-084 |
| P-48 | Lead Sheet | 3/27/12 | US0061-063 |
| P-49 | FBAR Penalties; Post 10/22/04; Non-BSA Examiners Lead Sheet (Tax Year 2007 2008) | 3/27/12 | P-00088-096 |
| P-50 | Lead Sheet | 3/27/12 | P-000087-088 |
| P-51 | Letter from Farber to West dated 4/17/12 re: FBAR filings and attaching 2006, 2007, 2008, 2009 FBARs | 4/17/12 | US0095-103 |
| P-52 | Examining Officer's Activity Record | 4/18/12 | P-000176-178 |
| P-53 | Multi-Tear and Related Returns Lead Sheet | 4/25/12 | P-000189-190 |
| P-54 | Internal Controls Lead Sheet; Fraud Development Lead Sheet; Civil Penalty Approval Form | 4/25/12 | P-000192-195 |
| P-55 | Remarks, Note, Actions Taken | 10/1/12 | P-000178-179 |
| P-56 | Fax to Bransky from Christiansen dated 3/1/13 attaching questionnaire | 3/1/13 | P-000475-476 |
| P-57 | Faxed answers to Christiansen's questionnaire dated 3/6/13 (see G-21) | 3/6/13 | P-000483-486 |
| P-58 | Email chain between Bransky and Christiansen dated 3/12/13 re: questionnaire | 3/12/13 | US0143 |
| P-59 | Letter from Arthur Bedrosian to Pamela Christensen | 4/15/13 | |
| P-60 | August 15, 2013 letter from Paul Ambrose to Denise Pygatt and exhibits thereto. | 8/15/15 | |

| EX. | DESCRIPTION | DOC. DATE | BATES |
|---|---|---|---|
| P-61 | UBS Treaty Case – Tier Analysis | | |
| P-62 | Classification Sheet – Offshore Compliance Initiatives – UBS Treaty | | |

# CERTIFICATE OF SERVICE

I, Beth L. Weisser, hereby certify that the foregoing Trial Memorandum was served by ECF, upon the following:

>Katherine M. Reinhart, Esquire
>Kavitha Bondada, Esquire
>Trial Attorneys, Tax Division
>U.S. Department of Justice
>P.O. Box 227
>Washington, D.C. 20044
>Katherine.Reinhart@usdoj.gov
>Kavitha.Bondada@usdoj.gov

>/s/ Beth L. Weisser
>Beth L. Weisser

Date:  August 28, 2017