IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARTHUR BEDROSIAN, | ) | |
| | ) | Case No. 2:15-cv-05853 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## UNITED STATES' TRIAL BRIEF

Pursuant to the Court's May 25, 2017 Order, the United States submits its trial brief on the factual and legal issues involved in this case, including the standard of review (Part II), the burden of proof (Part III), the legislative purpose underlying the Bank Secrecy Act (Part IV), the standard for willful violations of the requirement to report foreign bank accounts (Part V), and the calculation of the civil penalty at issue (Part VI).

## I.  INTRODUCTION

From the 1970s until at least 2007, Arthur P. Bedrosian ("Bedrosian") failed to report his bank accounts in Switzerland.  It is undisputed that in 2007 Bedrosian had two foreign bank accounts at UBS that he was required to report on an FBAR.  It is also undisputed that Bedrosian filed an FBAR for 2007 disclosing only one of his foreign accounts, his $200,000 account ending in 5316, and that he failed to report the larger of his two foreign accounts, his $2 million UBS account ending in 6167.  He failed to report even after his accountant told him that the law required he do so.   His decision to not report was knowing and voluntary (or, at a minimum, reckless), and therefore, willful.  *See* 31 U.S.C. §§ 5314, 5321; *United States v. Williams*, 489 Fed. Appx. 655, 658 (4th Cir. 2012).   A willful failure to report a foreign bank account violates

section 5314, and section 5321 imposes a penalty of up to 50% of the account balance for a willful failure to report. Because Bedrosian willfully failed to disclose his approximately $2 million foreign UBS account to the government, Bedrosian is indebted to the United States in the total amount of $1,007,345.48 as of September 10, 2015, plus statutory additions accruing after that date.

Bedrosian denies his actions were knowing and voluntary. While acknowledging that he failed to report his $2 million UBS account as required, he contends that he did not act willfully as he allegedly relied upon advice from an accountant when he chose not to report.

The evidence will show that after Bedrosian learned of the reporting requirements, he continued his failure to report and chose to keep his $2 million foreign account secret. The evidence will also show that after Bedrosian learned of the reporting requirements, he reported only a much smaller foreign account.

Congress imposed reporting requirements on United States persons (which includes citizens, resident aliens, trusts, estates, and domestic entities) that have an interest in foreign financial accounts in excess of $10,000. "The Bank Secrecy Act (the "BSA" or the "Act"), 31 U.S.C. §§ 5311–25, regulates offshore banking and contains a number of recordkeeping and inspection provisions." *United States v. Under Seal*, 737 F.3d 330, 333 (4th Cir. 2013). "Among the purposes of the BSA is 'to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings.' 31 U.S.C. § 5311." *Id.* The required reports fill an information gap caused by the lack of third party reporting from foreign banks. The required report is the report of foreign bank and financial accounts report ("FBAR"), which during the year in issue was form TD-90-22.1. The FBAR must be filed on or before June 30th of the year following the calendar year for which the report is made. 31 C.F.R.

§ 103.27(c); *United States v. Williams*, 489 Fed. Appx. 655 (4th Cir. 2012).   An individual – like Bedrosian – who fails to comply with the FBAR reporting requirements is subject to civil penalties.  31 U.S.C. § 5321. For willful – that is knowing and voluntary, or reckless – violations, the maximum penalty is either 50% of the bank account balance or $100,000, whichever amount is greater. 31 U.S.C. §  5321(a)(5).  There is no reasonable cause exception for willful violations of the FBAR reporting requirements.  31 U.S.C. § 5321(a)(5)(C)(ii).

## II.  STANDARD OF REVIEW

As was the case in *Williams*, the only issue before the Court is whether Bedrosian acted willfully in failing to report his $2 million UBS bank account on an FBAR form for the year 2007.   That is, whether Bedrosian's non-compliance was willful, because he knowingly and voluntarily failed to report his $2 million UBS account; or whether Bedrosian acted with reckless disregard in failing to report it.  *Williams*, 489 Fed. Appx. at 658.

The Court should determine *de novo* whether Bedrosian willfully violated the FBAR requirements.  Bedrosian filed this suit alleging that the small amount he paid with respect to the FBAR penalty assessed against him was an illegal exaction and that the United States should be ordered to return those funds.  An illegal exaction claim is a claim that money was "'improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'"  *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005), *quoting, Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Cl. Ct. 1967).   "The classic illegal exaction claim is a tax refund suit alleging that taxes have been improperly collected or withheld by the government."  *Id.*; *see also Cencast Services, L.P. v. United States*, 94 Fed. Cl. 425, 451 (2010) (stating that a tax refund suit involves a claim that the government, through the Internal Revenue Service, exacted money belonging to the taxpayer).  The United States then filed a counterclaim

3

contending that Bedrosian was liable for the remainder of the FBAR penalty assessed against him under 31 U.S.C. § 5321(a)(5) for willfully failing to report his $2 million bank account at UBS in Switzerland.

As Bedrosian admits, the applicable standard of review for both parties' claims is *de novo*. *See* Docket No. 46. "*De novo*" means that the Court's consideration of the willful penalty assessed against Bedrosian is a review of the evidence admitted at trial; it is not an appeal or review of the determination at the administrative level.[1] *United States v. Williams*, No. 1:09-cv-437, 2010 WL 3473311 (E.D. Va. Sept. 1, 2010), *rev'd on other grounds*, *United States v. Williams*, 489 Fed. Appx. 655 (4th Cir. 2012), *quoting*, *Eren v. Comm'r*, 180 F.3d 594, 597-598 (4th Cir. 1999); *see also United States v. McBride*, 908 F.Supp.2d 1186, 1201 (D. Utah 2012); *see National Right to Work Legal Def. & Educ. Fund. v. United States*, 487 F. Supp. 801, 805 (E.D.N.C. 1979) (in tax cases, "the court does not sit in judgment of the Commissioner; the court places itself in the shoes of the Commissioner"). As explained in the United States' Motion in Limine, the Third Circuit adopted the definition of *de novo* as "[a]new, afresh, a second time[.]" *Holland v. New Jersey Dep't of Corr.*, 246 F.3d 267, 278 (3d Cir. 2001).

Bedrosian asserts that *de novo* review means that the court should conduct a review of any administrative proceedings. He argues that excluding the Service's administrative findings, reports, and testimony, compromises his ability to "defend himself," and that excluding this evidence will deprive him of "an actual hearing on the merits of **its** [that is, the Service's]

---

[1] In contrast, Congress has given the Secretary of the Treasury broad discretion to determine the amount of a penalty. *See* 31 U.S.C. § 5321 (stating that the Secretary "may impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314" and setting ceilings for the amount of any penalty imposed).

willfulness finding." Doc. No. 46 (emphasis added). Bedrosian misunderstands the *de novo* standard of review. The trial in this case is not an appeal or review of the Service's determination at the administrative level. Instead, it is decision made by the factfinder on the merits of the case presented at trial.

In considering the evidence, the Court can consider inferences from "conduct meant to conceal or mislead" or from "a conscious effort to avoid learning about reporting requirements." *Williams*, 489 Fed. Appx. at 658, *quoting United States v. Sturman*, 951 F.2d 1466, 1476 (6th Cir.1991). Bedrosian, in an effort to have the Court review the administrative proceedings, contends that all evidence of his state of mind should be "equally admissible," but does not explain how the Service's investigation at the administrative level – what individual Service employees thought or did years *after* Bedrosian filed his 2007 FBAR but failed to disclose the $2 million UBS accunt – are relevant to *Bedrosian's state of mind at that time*.[2] To be sure,

_____

[2] Bedrosian to attempts to show that one Service employee had some type of animous against him and single-handedly pursued assessment of the willful penalty. First, the Service's actions at the administrative level are not relevant to this *de novo* proceeding. Second, assuming that the Service employees' views were relevant, it is well established that their personal opinions are not binding on the Service. *Estate of Akin v. United States*, 31 Fed. Cl. 89, 97 (1994); *Miller v. United States*, 949 F.2d 708, 712 (4th Cir. 1991) ("[I]t is clear that neither the government, nor a government agency such as the IRS, can be equitably estopped from asserting its legal rights because of the actions of an agent"); *Walsonavich v. United States*, 335 F.2d 96, 101 (3d Cir. 1964); *Sidell v. Commissioner*, 225 F.3d 103, 111 (1st Cir. 2000). The opinions of individual Service employees have no bearing on this Court's determination as to whether Bedrosian willfully failed to comply with the FBAR reporting requirements.

Finally, aside from being entirely baseless, such an assertion improperly focuses on one employee's motivation, or lack therof, instead of the agency's determination as to willfulness. This would be akin to, for example, focusing on an individual employee's purpose in issuing a summons instead of the institutional purpose. *See United States v. Rockwell Int'l*, 897 F.2d 1255, 1263 (3d Cir. 1990) (finding a district court erred by focusing on purported wrongdoing of a single Service employee instead of institutional purpose of the Service in issuing a summons).

evidence of Bedrosion's state of mind during 2007-2008 is relevant.  But that evidence is not found in the administrative proceedings.  Bedrosion was required to disclose his $2 million UBS account by June 30, 2008.  31 C.F.R. § 103.27(c).  Bedrosion fails to identify any evidence from the administrative proceedings that reveals *his state of mind during 2007-2008*.

### III.  <u>BURDEN OF PROOF</u>

In a civil case with respect to the penalty for failing to meet the reporting requirements for foreign bank accounts, the burden of proof is preponderance of the evidence.  *McBride*, 908 F.Supp.2d at 1201, *citing*, *Williams*, 2010 WL 3473311; *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983); *see also Grogan v. Garner*, 498 U.S. 279, 286 (1991); *United States v. Bohanec*, No. 2:15-cv-4347, 2016 WL 7167860 (C.D. Cal. Dec. 8, 2016).

Although Congress did not prescribe the standard of proof for FBAR cases, the "preponderance-of-the-evidence standard generally applicable in civil actions" is the correct standard for FBAR cases.  *See Herman & MacLean*, 459 U.S. at 390; *see also Grogan*, 498 U.S. at 286 (finding that when a statute does not prescribe the standard of proof, Congress' silence is inconsistent with a view that a heightened standard was intended).  The heightened standard of clear and convincing evidence only applies in civil cases involving "'particularly important individual interests or rights.'"  *Bohanec*, 2016 WL 7167860 at *6, *quoting*, *Herman & MacLean*, 459 U.S. at 389.  Those interests include parental rights, involuntary commitment, and deportation, but do not include the imposition of civil sanctions not involving those interests, even if such sanctions are severe.  *Id*.

The Supreme Court noted that "the difficulty of proving the defendant's state of mind supports a lower standard of proof."  *Herman & MacLean*, 459 U.S. at 390, n. 30.  As in *Bohanec*, the FBAR penalty at issue in this case does not rise to the level of a particularly

important individual interest or right that would justify a higher standard of proof.  *Bohanec*, 2016 WL 7167860 at *6.  Applying the preponderance of the evidence standard in this case would be consistent with Supreme Court precedent and other FBAR cases.  *See Herman & MacLean*, 459 U.S. at 389-390; *Bohanec*, 2016 WL 7167860 at *6; *McBride*, 908 F.Supp.2d at 1201-1202.

## IV.  SECRET FOREIGN ACCOUNTS UNDERMINE THE FAIR ADMINISTRATION OF TAX LAWS

Generally, United States citizens are subject to taxes on their income, regardless of where it is earned.  26 U.S.C. § 61(a); 26 C.F.R. § 1.1-1(b).  The Currency and Foreign Transactions Reporting Act, also known as the Bank Secrecy Act, was enacted in 1970, in part to ensure that citizens met the requirement to pay taxes on income earned abroad.  *See* Pub. L. 91-508, 84 Stat. 1118; H.R. Rep. No. 91-975 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4394, 4395, 4397 (stating that the BSA was enacted to deal with major issues in law enforcement, one of which was the use of secret foreign bank accounts to evade income taxes).  The purpose of the BSA is "to detect and prosecute criminal activity, pursue tax code enforcement, and engage in other 'regulatory investigations or proceedings.'"  *United States v. Simonelli*, 614 F.Supp.2d 241 (D. Conn. 2008), *quoting*, 31 U.S.C. § 5311; *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 26 (1974); *see also*, *United States v. Under Seal*, 737 F.3d 330, 333 (4th Cir. 2013).

Congress recognized that citizens' use of undisclosed foreign financial accounts caused significant federal tax losses as well as a gaping disparity in the enforcement of the internal revenue laws.  *Id*. at 4397-4398 (stating that one of the most damaging effects of the use of secret foreign accounts was the undermining of the fair administration of the tax laws, particularly through accounts in Switzerland, because such accounts are only available to the wealthy); *see also California Bankers Ass'n*, 416 U.S. at 26 (noting that the BSA was enacted after extensive

hearings regarding the unavailability of foreign and domestic bank records for customers believed to be violating criminal or civil laws).

To fill the information gap, the BSA requires citizens of the United States to keep records and file reports with the Service. Specifically, the BSA mandates that the Secretary of the Treasury require citizens who have interests in foreign accounts to keep records and report certain information about those accounts to the Government. 31 U.S.C. § 5314(a); *see also* 31 U.S.C. § 5314(b) (authorizing the Secretary to prescribe regulations implementing the statute).[3] Under the applicable regulations, citizens who had an interest in, or signature authority over, a foreign financial account are required to report the existence of the account and other information about the account, such as the account balance, to the Service each year. 31 C.F.R. § 103.24.[4] The reporting requirements apply to each foreign account that exceeded $10,000 during the calendar year. 31 C.F.R. § 103.27(c). As explained above, the form used to report the information required by section 5314 is the Report of Foreign Bank and Financial Accounts (TD-F 90-22.1), commonly known as an "FBAR." 31 C.F.R. § 1010.350. An FBAR must be filed with the Service by June 30th for each account that met the reporting requirements during the previous year. 31 C.F.R. § 103.27(c).

---

[3] The requirement to report information regarding foreign accounts under Title 31 is in addition to the requirement for a taxpayer to report on a Schedule B of his income tax return that he owns foreign accounts and all income earned from such accounts. *See* https://www.irs.gov/uac/about-schedule-b-form-1040.

[4] The regulations governing the FBAR were published as cited above during the year at issue in this case, but were recodified in a new chapter in 2011. *See* 31 C.F.R. § 1010.350(a); 31 C.F.R. § 1010.306(c).

Section 5321 authorizes the Secretary of the Treasury to impose a civil penalty on any person who does not comply with the reporting requirements described above. 31 U.S.C. § 5321(a)(5). The penalty is divided into two categories depending on the violator's level of culpability: 1) a penalty for non-willful violations which cannot exceed $10,000 and 2) a penalty for willful violations that cannot exceed the greater of $100,000 or 50% of the balance of the account at the time of the violation. 31 U.S.C. § 5321(a)(5)(C), (D).[5] There is no reasonable cause exception for willful violations of the FBAR reporting requirements. 31 U.S.C. § 5321(a)(5)(C)(ii).

## V.      THE EVIDENCE AT TRIAL WILL DEMONSTRATE THAT BEDROSIAN WILLFULLY FAILED TO DISCLOSE HIS $2 MILLION UBS ACCOUNT

### A.  *Bedrosian was Subject to the Reporting Requirements of Section 5314*

Bedrosian was subject to the requirements of section 5314 in 2007 because he was a United States citizen who owned or had signature authority over two foreign accounts that had a balance of over $10,000 during the year, one ending in 5316 and one ending in 6167. *See* 31 U.S.C. § 5314. Both of Bedrosian's UBS accounts had balances of well over $10,000 during 2007. These facts are undisputed. Therefore, Bedrosian was subject to the reporting requirements of section 5314 during 2007 with respect to both of his UBS accounts. He was required to report on on one or more FBARs information about <u>both</u> accounts. Instead, he filed a

---

[5] Congress amended section 5321 in the American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418, 1586 (2004), under the subtitle "Provisions Relating to Tax Shelters." The prior version of section 5321 only authorized a penalty for willful violations of the reporting requirements and capped the penalty at $100,000. 31 U.S.C. § 5321(a)(5) (2001). Congress explicitly increased the maximum penalty for willful violations to the greater of $100,000 or 50% of the bank account balance at the time of the violation. *See* 31 U.S.C. § 5321(a)(5).

single FBAR reporting only his $200,000 account ending in 5316, and failed to report his $2 million account ending in 6167.

### B. The Legal Standard for Willfulness Includes Both Knowing and Reckless Violations of a Standard

Section 5321 authorizes the Service to impose a penalty for willful violations of the reporting requirements, but the term "willful" is not defined in section 5321. *See generally* 31 U.S.C. § 5321. Because section 5321 involves civil penalties, the relevant definition of willfulness is the definition applied in other civil contexts, including tax collection and compliance with reporting requirements. *McBride*, 908 F. Supp. 2d at 1204. The Supreme Court has defined willfulness in civil cases as including both knowing and reckless violations of a standard. *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57 (2007) (explaining that this definition is consistent with common law usage of the term, which treated reckless disregard of the law as a willful violation). In civil cases involving reporting or disclosing information to the Service, the term willfulness covers all conduct that is voluntary, instead of merely accidental or unconscious. *McBride*, 908 F.Supp.2d at 1205. A reckless disregard of a statutory duty will satisfy the willfulness standard. *Id.* at 1204. "An improper motive or bad purpose is not necessary to establish willfulness in the civil context." *Id.* (internal citations omitted). The relevant inquiry is whether the failure to disclose the information was purposeful instead of inadvertent, not whether the taxpayer subjectively believed he was not required to file an FBAR. *See Lefcourt v. United States*, 125 F.3d 79, 83 (2d Cir. 1997) (finding that after it is established that a failure to disclose information was done purposefully, whether the filer believed he was legally justified in withholding the information is irrelevant); *McBride*, 908 F.Supp.2d at 1210 (finding that if subjective intent were required, every person would be able to escape liability by avoiding learning of the reporting requirements).

10

Congress did not differentiate between those who have foreign bank accounts for a nefarious purpose and those who have garden-variety investments accounts. Both categories of account holders can be liable for willfully failing to disclose the existence of their foreign accounts. Moreover, direct evidence of intent is not required to establish a violation was willful – persons who fail to file an FBAR are not likely to admit they knew of the filing requirement and chose not to comply with it. *Id*. at 1205. Willfulness can be shown through circumstantial evidence and reasonable inferences drawn from the facts before the court. *Id*.; *see also Williams,* 489 Fed. Appx. at 658-659.

The instant case involves Bedrosian's civil liability for failing to report one of his UBS accounts, not whether he committed a crime when he concealed the account. *Compare* 31 U.S.C. § 5321(a)(5) (authorizing the Secretary of the Treasury to impose a civil penalty against persons who violate section 5314); 31 U.S.C. § 5322 (providing that a person who willfully violates section 5314 is subject to a fine, imprisonment, or both). Thus, the appropriate standard for willfulness is a civil standard, not a criminal standard.

The particular concern justifying a heightened standard for willfulness in a criminal proceeding, that a person will be subject to a felony conviction based on complicated tax law, is not present in this civil penalty case. *Lefcourt v. United States*, 125 F.3d 79, 83 (2d Cir. 1997) (finding that the willfulness standard in a criminal case did not apply because the "concern that an individual taxpayer unfamiliar with the nuances of the tax code might confront a felony conviction" is not present in a case solely involving civil penalties). Moreover, no court to consider the question has adopted the view asserted by Bedrosian. *Bohanec*, 2016 WL 7167860 at *5 (finding that "no court has adopted [the] principle in a civil tax matter" that willfulness is limited to "intentional violations of known legal duties"). As decribed below, the evidence will

demonstrate that knowingly and voluntarily failed to report his $2 million UBS account, or at a minimum, recklessly disregarded the requirement to file an FBAR for his $2 million UBS account.

### C. The Evidence At Trial Will Show that Bedrosian Knowingly Violated the FBAR Filing Requirements

Bedrosian (over the course of this litigation) has put forth varying reasons for why his failure to report his $2 million UBS account was not willful. Bedrosian is a law school graduate and a corporate executive in a heavily regulated industry. Long before the year at issue, he routinely reviewed and signed complex financial statements, signed corporate contracts, and researched government regulations. He even prepared his own tax returns before hiring an accoutantant, and occasionally conducts his own tax research. Every time Bedrosian filed an IRS Form 1040, he was asked about the existence of foreign accounts and informed that if he had such accounts he would need to file the TD-90-22.1, otherwise known as an FBAR.

Bedrosian admits that he first opened a Swiss bank account in the 1970s, which is contemporaneous with the enactment of the BSA. For two decades, he did not report the existence of his foreign bank account or the income earned from them. Bedrosian paid UBS to stop mailing any information about his accounts to the United States, even though he was concerned with the accounts' performance. Bedrosian contends that UBS suggested the mail hold. But he does not deny that he went along with the suggestion and signed. Instead of receiving mail from UBS at his address in the United States, Bedrosian met in person with his Swiss banker annually to review his accounts' performance. At some point, Bedrosian changed his UBS savings accounts into investment accounts. Bedrosian also claims that was a UBS banker's idea. Bedrosian knew that he had changed his UBS accounts from savings accounts to investments accounts intended to make a profit. Bedrosian knew that his UBS accounts

contained over $1 million at that time. He also knew he had an account ending in 6167 (the unreported account) in addition to his 5316 account (the account reported for 2007). He also knew, at least annually, whether his UBS accounts were making money.

First, Bedrosian alleges he did not report the accounts because his accountant never asked if he had a foreign account and then because the accountant told him he should not report the accounts on his tax returns until he repatriated the money. In the early 1990s when Bedrosian finally told his accountant that he had foreign bank accounts, his accountant, Seymour Handleman, warned him that he had a problem because he had been violating the law by not reporting the accounts for years. Instead of immediately rectifying the problem, Bedrosian decided to continue to ignore the law. Bedrosian claims he was worried that there might be adverse consequences for his long history of non-compliance and wanted to avoid any repurcussions. According to Bedrosian, but otherwise uncorroborated, Handleman told him that he could wait until he repatriated the money to pay taxes on the income earned from the account. There is no writing to confirm this alleged advice. Bedrosian allegedly relied on Handleman even though he had questioned his advice because the accountant suffered a series of strokes. There is no testimony from Handleman to confirm this advice because Handleman is deceased (and has been since 2007). Handleman allegedly based this advice on Bedrosian's assertion that the account was a simple savings account with no activity. Even if Handleman in fact provided such advice, the advice concerns the payment of income tax on money hidden in an offshore account. The advice does not concern the requirement to file a TD-90-22.1 in compliance with

the Bank Secrecy Act.[6]  Nor does the advice conform to the fact that accounts changed from simple savings accounts to investment accounts.

Bedrosian claims that once he was told by Handleman of the need to report his foreign accounts he was worried about the consequences for his non-compliance.  He took a calculated risk that he would not be discovered when he continued to keep both accounts secret.  He then took another calculated risk when he signed an FBAR for 2007 that only reported one account that contained less than $1 million.  This strategy continued for 2008, when Bedrosian filed an FBAR containing the same information as the year before.  Bedrosian knew the Service would not be able to discover his larger UBS account ending in 6167, because he did not report the income he earned from his UBS accounts on his federal income tax returns and he had paid UBS to refrain from sending any documentation to the United States.

But then UBS told him that it was turning his account information over to the Service.  Once Bedrosian learned that his information was being turned over to the Serivce, Bedrosian filed amended tax returns reporting the income he earned from his UBS accounts and filed amended FBARs to report both of his UBS accounts.  Then he applied for the Offshore Voluntary Disclosure Program in an attempt to receive a reduced civil penalty and a waiver of criminal penalties for his earlier noncompliance.[7]  Bedrosian was too late, however.  UBS had

---

[6] As discussed above, the penalty for failure to comply with the Bank Secrecy Act, 31 U.S.C. §§ 5314 and 5321, applies each and every year that there is a reporting failure.  And, there is no reasonable cause defense to the penalty.  31 U.S.C. § 5321(a)(5)(C)(ii).

[7]  The Service announced an offshore voluntary disclosure program in March 2009 through which taxpayers could disclose their foreign accounts, pay taxes on their previously unreported foreign income, possibly avoid criminal prosecution, and limit their liability for penalties.  www.irs.gov/uac/voluntary-disclosure-questions-and-answers, Q3.  Taxpayers were required to apply for acceptance into the program by October 15, 2009. www.irs.gov/uac/2009- (continued...)

already turned over his information to the Service, and, therefore, he was denied acceptance into the program. He vaguely claims that Internal Revenue Service employees gave him inaccurate advice about whether he could or should attempt to re-apply, even though he had already been determined to be ineligible. Even if such statements were made, he cannot rely on them to show he is not liable for the willful FBAR penalty. *See Miller v. United States*, 949 F.2d 708, 712-713 (4th Cir. 1991). Such calculated conduct support the finding that Bedrosian was willful when he failed to report his $2 million UBS account.

During the year at issue, Handleman passed away and Bedrosian hired a new accountant, Sheldon Bransky, to prepare his 2007 federal income tax return. Bedrosian belatedly filed an FBAR for 2007 reporting only his $200,000 UBS account. For the first time, he checked the box on Schedule B of his tax return that he owned a foreign bank account.[8]

Second, during summary judgment briefing, Bedrosian, rather than claiming reliance on Handlemen's advice, asserted for the first time that omitting the $2 million UBS account was an unintentional oversight. He asserts, moreover, that he should not be penalized for his failure to report the $2 million UBS account because reporting one account on his FBAR and referencing the country where he held foreign accounts, was enough to satisfy the FBAR requirement for all his foreign accounts.

---

(… continued)

offshore-voluntary-disclosure-program. One requirement that had to be met for a taxpayer to be accepted into the program was that the taxpayer must have submitted an application before the Service received information from another source regarding the taxpayer's foreign accounts. www.irs.gov/uac/voluntary-disclosure-questions-and-answers, Q52.

[8] This is the place on the return that directs the filer to the FBAR, TD F 90-22.1.

Reporting one foreign account is not sufficient to comply with the FBAR requirements. Because the reporting requirements in section 5314 apply to every foreign account that exceeded $10,000 during the calendar year, simply filing one FBAR reporting one account does not satisfy the requirements for other accounts. 31 C.F.R. §§ 103.24, 103.27(c). This is consistent with the purpose of the FBAR reporting requirements, which is to provide information to the government about financial accounts it is unable to obtain elsewhere. This is particularly true here, because by concealing his far more valuable UBS account and all of his foreign investment income, Bedrosian initially reported a lower federal income tax liability for 2007. Bedrosian's suggested reading of the requirements allows the selectively reporting of their foreign accounts. Everyone with a foreign account would simply open two, one with $10,001 to report and a second with everything else to not report.

For a third excuse, Bedrosian claimed during summary judgment that he did not understand that he had two accounts at UBS. For this excuse, Bedrosian claims UBS caused this problem. Again, Bedrosian's claims are uncorroborated by any writing or third-party testimony. Casting further doubt on Bedrosian's claims is the evidence that Bedrosian closed both of his UBS accounts a matter of weeks after filing his 2007 FBAR through *two separate letters,* one for each account, and by transferring the funds to *two separate accounts*, one foreign and one domestic. It strains credulity to believe that merely a couple of weeks earlier, Bedrosian did not understand he had two accounts with UBS.

### D. The Evidence At Trial Will Show that, at a Minimum, Bedrosian Recklessly Disregarded the FBAR Filing Requirements

All citizens are charged with knowledge of the law as well as knowledge of the contents of documents that they sign, including tax returns. *McBride*, 908 F.Supp.2d at 1205-1206 (internal quotations omitted). This is true regardless of whether an accountant or other

16

professional prepared the return. *Id.* at 1206-1207; *Williams*, 489 Fed. Appx. at 659; *see also Novitsky v. Am. Consulting Engr's, LLC*, 196 F.3d 699, 702 (7th Cir. 1999) (explaining that arguments blaming accountants for inaccurate tax returns are not effective, because "[p]eople are free to sign legal documents without reading them, but the documents are binding whether read or not").

To hold otherwise would encourage taxpayers to sign tax returns without reading them in the hope of avoiding any negative consequences from inaccurate reporting. *Novitsky*, 196 F.3d at 702. It would also allow taxpayers to fabricate stories that they did not read or understand the documents that they signed and such stories would be almost impossible to refute. *Id*. As the court explained in *McBride*, a taxpayer cannot escape liability by simply claiming he did not read what he was signing and therefore his violation of the law was not willful. *McBride*, 908 F.Supp.2d at 1207. Courts long ago recognized that "innocence cannot outdistance ignorance." *Katz v. United States*, 321 F.2d 7, 10 (1st Cir. 1963) (stating that a return is not less inaccurate because the taxpayer chose to be uninformed as to the extent that the return is inaccurate).

When Bedrosian signed his 2007 Form 1040 (and all the previous Forms 1040 since the opening of his UBS accounts) he was put on notice that he needed to report his foreign accounts. Schedule B of the 2007 Form 1040 asks the question whether the filer had an interest in or signatory authority over a financial account in a foreign country. Bedrosian marked the "YES" box with an "x". The same line that asks about foreign accounts also directs the filer to review the requirements for filing an FBAR, TD-90-22.1. The instructions for the TD-90-22.1 made his obligation to file even clearer. Bedrosian had actual notice, as well as constructive notice, since he did file the TD-90-22.1 for 2007. Bedrosian was on notice of the need to file an FBAR for each and every foreign account that exceeded $10,000. He cannot claim lack of willfulness by

failing to inquire further about his obligaitons or failing to read the forms he signed (under penalty of perjury).

Bedrosian knew he had foreign accounts. He paid additional money to UBS to stop mailing any information about his accounts to the United States, even though he was concerned with the accounts' performance. Instead of receiving mail from UBS, Bedrosian met in person with his Swiss banker annually to review his accounts' performance. Bedrosian knew that he had changed his UBS accounts from savings accounts to investments accounts intended to make a profit. Bedrosian knew that his UBS accounts contained over $1 million (well over the $10,000 reporting threshold) and that he had an account ending in 6167 in addition to his 5316 account.

As discussed above, in civil cases, reckless disregard for the legal consequences of his acts is sufficient to show that a person willfully violated a statutory duty. A person acts with reckless disregard when violating a statute if he knows of an unjustifiably high risk of harm or the risk is so obvious that he should have known and he commits a violation anyway. *Safeco Ins. Co. of America*, 551 U.S. at 68-69; *McBride*, 908 F.Supp.2d at 1205 (conduct qualifies as willful when evidencing reckless disregard of a known or obvious risk). Reckless disregard can also be inferred when a person is aware of a high probability that he has a tax liability but purposefully avoids learning facts that would confirm the liability. *Williams*, 489 Fed. Appx. at 658; *McBride*, 908 F.Supp.2d at 1205 (stating that a person acts willfully when he consciously avoids learning of reporting requirements).

At a minimum, Bedrosian recklessly disregarded the reporting requirements of section 5314. Bedrosian is charged with knowledge of his tax return, including the directions on Schedule B for a taxpayer who has foreign bank accounts to determine whether they are required

to file an FBAR. On a Schedule B, taxpayers must declare whether they have an interest in a foreign bank account or signature authority over such an account. The form then explicitly directs taxpayers to review the instructions and exceptions for filing Form TD-90-22.1, also known as an FBAR. A taxpayer who has a foreign bank account can be reasonably expected to read the information included in his tax return, including the reference to the FBAR on Schedule B. *United States v. Sturman*, 951 F.2d 1466, 1477 (6th Cir. 1991) (finding that the defendant could have learned of the requirement to file an FBAR quite easily). The reference to the instructions for the FBAR puts a taxpayer on inquiry notice of the FBAR filing requirement. *Williams*, 489 Fed. Appx. at 659. Failure to read Schedule B qualifies as a conscious effort to avoid learning of the FBAR requirements. *Id*.

Bedrosian should have known that there was a significant risk that he was violating the law, and he chose to take that calculated risk. He knew that he was reporting income earned from his domestic accounts but not his foreign accounts even though he understood that there was no difference between his domestic and foreign investment income. He paid UBS not to send any documents regarding his accounts to the United States, even though it concerned him not to receive reports with respect to his accounts' performance. Bedrosian relied on an accountant whose advice he had questioned because the accountant suffered a series of strokes. Despite his faltering confidence in his accountant, Bedrosian did not seek a second opinion from another tax professional, and did not raise the issue with his new accountant. Bedrosian had the means and ability to do his own tax research and to find the FBAR form, fill it out, and file it without help from an accountant. Bedrosian therefore acted with reckless disregard when he failed to report his $2 million UBS account ending in 6167 on his 2007 FBAR.

## VI. THE EVIDENCE AT TRIAL WILL DEMONSTRATE THAT THE AMOUNT OF THE FBAR PENALTY ASSESSMENT WAS PROPER

*A.      The Penalty Imposed is Properly Calculated as One-half of the Account Balance*

Section 5321 imposes a ceiling for the penalty for failing to comply with the reporting requirements, but otherwise leaves the amount of the penalty to the Service's discretion. 31 U.S.C. § 5321(a)(5).  The Internal Revenue Manual contains informal guidance for examiners in determining the amount of the penalty.  *See* I.R.M. 4.26.16.4.6.1, 2008 WL 5900937 (July 1, 2008); I.R.M. 4.26.16.4.6.3, 2008 WL 5900939 (July 1, 2008).  The guidance, however, is not binding.  *Keller v. Commissioner*, 568 F.3d 710, 720-721 (9th Cir. 2009).

The Internal Revenue Manual provides a two-step process for examiners to determine if a penalty lower than the statutory maximum could apply.  *See* I.R.M. 4.26.16.4.6.1, 2008 WL 5900937 (July 1, 2008) (providing that a lower penalty <u>might</u> apply depending on the taxpayer's ability to meet threshold requirements <u>and</u> the balance of the foreign bank accounts) (emphasis added); I.R.M. 4.26.16.4.6.3, 2008 WL 5900939 (July 1, 2008).  The first step involves applying four threshold conditions.  *Id.*[9]  If those conditions are met, a tiered analysis is applied to determine the amount of the penalty, based on the account balance.  *Id.*  Even if a taxpayer meets all of the threshold conditions, however, the maximum penalty still applies where the taxpayer's

---

[9]  The threshold conditions are as follows: 1) the taxpayer has no history of FBAR penalty assessments or criminal tax or BSA convictions; 2) the funds in the accounts were not from an illegal source or used to fund a criminal purpose; 3) the taxpayer cooperated during the examination; and 4) the Service did not assess a civil fraud penalty against the taxpayer with respect to the income attributable to a foreign account.  I.R.M. 4.26.16.4.6.1, 2008 WL 5900937 (July 1, 2008).  The United States does not dispute that Bedrosian met the four threshold conditions.

foreign account had a sufficiently high balance, over $1 million.  I.R.M. 4.26.16.4.6.3, 2008 WL 5900939 (July 1, 2008).

After applying the mitigation guidelines to this case, the maximum penalty of 50% of the account balance would still be applicable for Bedrosian's failure to report his UBS account ending in 6167.  During 2007, Bedrosian's account contained over $1 million.  Therefore, he did not qualify for a reduced penalty under the Service's mitigation guidelines.  I.R.M. 4.26.16.4.6.3, 2008 WL 5900939 (July 1, 2008) (providing that if the maximum account balance exceeded $1 million at any time during the year, the statutory maximum penalty applies).  The maximum penalty for willful violations of the reporting requirements is the greater of $100,000 or 50% of the bank account balance at the time of the violation.  31 U.S.C. 5321(a)(5)(D).  Because fifty percent of the balance of Bedrosian's account ending in 6167 was over $100,000, the Service assessed a penalty in the amount of $975,789.17.  Thus, the amount of the penalty assessed against Bedrosian was proper under section 5321.

B. *Bedrosian Owes Interest and a Late-Payment Penalty for his Failure to Pay the FBAR Penalty*

Title 31 of the United States Code provides for the accrual of interest on debts owed to the United States.  31 U.S.C. § 3717(a)(1).  Interest begins to accrue from the date that notice of the amount due is first mailed to the person who owes the debt.  31 U.S.C. § 3717(a)(2)(b).  In addition, a late-payment penalty must be assessed for the part of the debt that remains unpaid after 90 days.  31 U.S.C. § 3717(e)(2).  The late-payment penalty is capped at six percent per year.  *Id*.

The Service mailed notice of the amount due to Bedrosian on January 30, 2015.  Under section 3717, interest begins to accrue on that date.  31 U.S.C. § 3717(a)(2)(b).  From January

30, 2015 to September 10, 2015, interest accrued in the amount of $5,902. Interest continues to accrue until the penalty is paid in full.

Section 3717 also provides that a penalty applies to the portion of a debt that has not been paid after 90 days. Bedrosian made one payment in the approximate amount of $9,500, which is reflected in the statement of the amount due. The late-payment penalty applies until Bedrosian fully pays the FBAR penalty assessed against him. As of September 10, 2015, the amount of the penalty was $35,412. Taking into account interest, the late-payment penalty, and the FBAR penalty, Bedrosian is indebted to the United States in the total amount of $1,007,345.48 as of September 10, 2015, plus statutory additions, including interest, accruing after that date. As stated above, the United States is entitled to a judgment against Bedrosian in that amount, plus interest and the late payment penalty until the judgment is satisfied.

## CONCLUSION

Bedrosian is a well-educated, sophisticated taxpayer who is also a corporate executive.

He willfully failed to report his $2 million UBS account on his 2007 FBAR, and should be held

liable in the total amount of of $1,007,345.48, as of September 10, 2015.

Date: August 28, 2017                    Respectfully submitted,

                                         LOUIS D. LAPPEN
                                         Acting United States Attorney

                                         DAVID A. HUBBERT
                                         Acting Assistant Attorney General

                                         /s/Kavitha Bondada
                                         KAVITHA BONDADA
                                         KATHERINE REINHART
                                         Trial Attorneys, Tax Division
                                         U.S. Department of Justice
                                         P.O. Box 227
                                         Washington, D.C.  20044
                                         202-307-6528/6536 (v)
                                         202-514-6866 (f)
                                         Katherine.Reinhart@usdoj.gov
                                         Kavitha.Bondada@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing *United States' Trial Brief* was filed on August 28, 2017

through the Court's CM/ECF filing system, which will automatically send a copy to the

following:

Patrick Egan
Beth Weisser
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, Pennsylvania 19103
*Counsel for the Plaintiff*

/s/Kavitha Bondada
KAVITHA BONDADA
