IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARTHUR BEDROSIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:15-cv-05853 |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |

### UNITED STATES' SUPPLEMENTAL BRIEFING

Plaintiff Arthur Bedrosian took a calculated risk when he decided not to report the approximately $2 million he held in a foreign bank account on his 2007 Foreign Bank Account Reporting Act form ("FBAR").  *Bedrosian v. United States*, No. 15-5853, 2017 WL 4946433 at *5 (E.D. Pa. Sept. 20, 2017).  Bedrosian's failure was willful, because, at a minimum, he was reckless.  *Bedrosian v. United States*, 912 F.3d 144, 152 (3d Cir. 2018).  Bedrosian took an unjustifiably high risk of harm that was either known or so obvious that it should be known.  *Id.* at 153.  This Court has already found uncontradicted evidence of recklessness, as it found, for example, that Bedrosian:

- decided to maintain two foreign bank accounts,

- asked his accountant for advice on how to handle his foreign bank accounts and was told he was breaking the law by failing to report them;

- nevertheless, continued not to report the accounts or pay tax on the investment income he earned from those accounts for years;

- submitted an FBAR reporting one of his foreign accounts to the IRS *only after* UBS told him it was giving him 60 days to close his accounts,

- knowing he had two foreign accounts, submitted an FBAR for 2007 and reported only one – the smaller – of his two accounts; reported that he had less than $1 million dollars

in his foreign accounts, when in reality he had approximately *twice* that amount in his accounts; and

- after notice of possible disclosure by UBS, decided to repatriate the smaller account and report it on an FBAR form and moved the more than $1 million in his larger account to another Swiss bank, apparently with the hope of keeping the existence of this account and the income earned on that account secret.

The Third Circuit remanded this matter to evaluate Bedrosian's conduct under an objective standard of civil willfulness, which includes both knowing and reckless conduct. *Bedrosian*, 912 F.3d at 153-154.  Even if this Court credits all of Bedrosian's testimony, these facts establish Bedrosian failed to employ the necessary level of care to fully comply with his reporting obligations – obligations which follow from his decision to maintain foreign bank accounts.  At a minimum, he proceeded with reckless disregard of the risk that he was not fully compliant with the FBAR reporting requirements.  Accordingly, this Court should conclude that Bedrosian willfully failed to report his larger UBS account on his 2007 FBAR.

The account balance during and at the end of 2007 was approximately $2.3 million. Govt. Ex. H.  In calculating the penalty amount, the Service looked to the account balance in U.S. dollars as of June 30, 2008, the date the 2007 FBAR was due, *i.e.,* the date of violation. The Service looked to the monthly account balances provided by UBS pursuant to a treaty request.  The monthly account balance in Bedrosian's 6167 account in June of 2008 was $1,951,578.34.  Govt. Ex. T.  The penalty is fifty percent of the June 30, 2008 balance of $1,951,578.34, for a total penalty of $975,789.17.  This Court should award judgment to the United States for $975,789.17, plus interest and late payment penalties that accrue as a matter of law.

2

## I.        BACKGROUND

The Currency and Foreign Transactions Reporting Act, also known as the Bank Secrecy

Act ("BSA") was enacted in 1970, in part to insure that citizens met the requirement to pay taxes

on income earned abroad.[1]   *See* Pub. L. 91-508, 84 Stat. 1118; H.R. Rep. No. 91-975 (1970),

*reprinted in* 1970 U.S.C.C.A.N. 4394, 4395, 4397 (stating that the BSA was enacted to deal with

major issues in law enforcement, one of which was the use of secret foreign bank accounts to

evade income taxes).  The statute:

> was enacted initially as part of the Bank Secrecy Act of 1970,
> which was intended to promote, among other things, the collection
> of federal taxes. *See* 31 U.S.C. § 5311; *see also United States v.
> Chabot*, 793 F.3d 338, 344 (3d Cir. 2015) (describing the purpose
> of the Bank Secrecy Act: "for tax collection, development of
> monetary policy, and conducting intelligence activities"). In
> passing that Act, Congress was particularly concerned with
> "[s]ecret foreign financial facilities, particularly in Switzerland,"
> that offered the wealthy a "grossly unfair" but "convenient avenue
> of tax evasion." H.R. Rep. No. 91-975 at 13 (1970), *reprinted
> in* 1971-1 C.B. 559, 561.

*Bedrosian*, 912 F.3d at 150–151.  Congress recognized that citizens' use of undisclosed foreign

financial accounts caused significant federal tax losses as well as a gaping disparity in the

enforcement of the internal revenue laws.  Pub. L. 91-508, 84 Stat. 1118; H.R. Rep. No. 91-975

(1970), *reprinted in* 1970 U.S.C.C.A.N. 4394, 4397-4398 (stating that one of the most damaging

effects of the use of secret foreign accounts was the undermining of the fair administration of the

---

[1] The United States' tax system reaches all U.S. citizens' income, no matter where in the
world it is earned, unless it is specifically excepted.  *Maze v. Internal Revenue Serv*., 206 F.
Supp. 3d 1, 5 (D.D.C. 2016), *aff'd,* 862 F.3d 1087 (D.C. Cir. 2017).  Explaining that the self-
reporting system in the United States depends on the honesty of each taxpayer, the court in *Maze*
noted that "'basically the Government depends upon the good faith and integrity of each
potential taxpayer to disclose honestly all information relevant to tax liability.'" *Id.* (quoting
*United States v. Bisceglia*, 420 U.S. 141, 145 (1975)).

tax laws, particularly through accounts in Switzerland, because such accounts are only available to the wealthy); *see also California Bankers Ass'n v. Shultz*, 416 U.S. 21, 26 (1974) (noting that the BSA was enacted after extensive hearings regarding the unavailability of foreign and domestic bank records for customers believed to be violating criminal or civil laws).

In the BSA, Congress confronted the "serious and widespread use," for the "purpose of violating American law," of "foreign financial facilities located in" jurisdictions that provided secrecy to account holders.  Pub. L. No. 91-508, 84 Stat. 1114 (1970); H.R. Rep. No. 91-975 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4394, 4397.  To combat the use of such secret accounts, Congress required citizens of the United States who have relationships with foreign financial agencies to file an FBAR.  *See* 31 U.S.C. § 5314(a) (describing individuals and entities required to file an FBAR).

In 2004, Congress changed the civil penalties for a failure to file an FBAR.  *See* American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 821, 118 Stat. 1418, 1586m *codified at* 31 U.S.C. § 5321 (2004).  The amended penalties now cover all failures to report a foreign account, whether willful or not, and increased the maximum possible amount of the penalty.  *Id.*  § 5321(a)(5)(C) & (D)(ii).

Congress made this change in response to a report from the Secretary estimating that only about 20 percent of taxpayers required to file an FBAR actually did so, and noting that approximately 800,000 individuals each year failed to comply with the requirement.  *See* H.R. Conf. Rep. No. 108-755, at 615 (2004), *reprinted in* 2004 U.S.C.C.A.N. 1341, 1667; U.S. Dep't

of the Treasury, *A Report to Congress* 6 (Apr. 26, 2002).[2]  Congress also determined that improved FBAR compliance "is vitally important to sound tax administration, to combating terrorism, and to preventing the use of abusive tax schemes and scams."  S. Rep. No. 108-192, at 108 (2003).

## II.     STATEMENT OF FACTS

### A.  <u>Bedrosian Decided to Maintain Foreign Bank Accounts.</u>

Arthur Bedrosian is a successful businessman who has worked in the pharmaceutical industry since the 1960s.  He also has a law degree.  Trial Tr. 25:18-25, 26:6-8, 38:25, 39:1, 83:10-13, *Bedrosian*, 912 F. 3d 144 at 147. He also has a law degree.  *Id.*  At the time of the trial in this case, he was the chief executive officer of Lannett Company, Inc., a manufacturer of generic pharmaceuticals.  Trial Tr.  83:10-13.

In 1973, around the time Bedrosian became a corporate executive, he opened a savings account with a Swiss bank (later acquired by UBS).   Trial Tr. 28:6-8, 29:22-25, 31:2-13, 37:13-19, 83:24-25, 84:1-8.  Bedrosian opened this savings account in Switzerland so that he could make purchases while traveling abroad for work without relying solely on traveler's checks. *Bedrosian*, 912 F. 3d at 147.

In the 1980s, Bedrosian converted his UBS savings account to an investment account. Trial Tr. 84:5-13.[3]  Bedrosian knew that investment income was taxable. Trial Tr. 98:25, 99:1-5;

---

[2] *Available at* https://www.treasury.gov/press-center/press-releases/Documents/fbar.pdf.

[3] Stating that Bedrosian "did not take a particularly active role in managing the account" ending in 6167, this Court noted that Bedrosian only converted the account from a savings account into an investment account in 2005.  *Bedrosian*, 2017 WL 4946433 at *1.  As explained above, the conversion actually occurred in the 1980s.

Govt Ex. M, N.  During the 1990s, he saw a Wall Street Journal article about the federal government tracing mail from Switzerland through postage meter numbers. Trial Tr. 49:11-25, 50:19-23; 49:23-25, 50:1-7, 93:14-22.  In 1993, Bedrosian elected to stop receiving mail in the United States from UBS and paid a hold-mail fee to ensure no mail was sent to the United States; he subsequently renewed this election in 2004.  Trial Tr. 49:11-25, 50:19-23, Govt. Ex. F. Instead, he stayed on top of the performance of his account by phone or through face-to-face meetings with a UBS representative in New York City.  Trial Tr. 90:6-10, Govt. Ex. I. Bedrosian had multiple contacts each year with UBS, from at least 2001 through 2008 (excepting 2002), through email, phone calls, and/or personal visits.  *Id*.  Bedrosian kept in touch with his UBS bankers because he was worried that they would "lose it all or steal it all or made [sic] bad investments." Trial Tr. 87:9-16.

In 2005, Bedrosian borrowed 750,000 Swiss Francs, or approximately $575,000, from UBS to be invested by the bank on his behalf.  *Bedrosian*, 2017 WL 4946433 at *1, Pl. Ex 6. Bedrosian decided to open a second account.   *Compare* Pl. Ex. 6 (referencing 750,000 Swiss francs, not dollars) *with* Govt. Ex. I, pg. P-002356 (referencing closing out a loan in September, 2007) *and* Govt. Ex. L, pg. US244.  Bedrosian's original account – from the 1970s – was account number ending 6167, and his second account with UBS was account number ending in 5316.  Pl. Ex. 13 (statements prior to 2005 could not be provided because the account was not open then); Govt. Ex. I, pgs. P-002355, P-002356 (notes in April and September, 2005 that he might open an account, that he opened "a name account which he might declare" and note in March, 2006 regarding the performance of his "new account with the $200k"); *see* Govt. Exs. D, E.

By the end of 2007, Bedrosian had gross assets of approximately $2 million in his

longstanding account, which had an account number ending in 6167, and approximately $240,000 in his newer account, which had an account number ending in 5316.  Trial Tr. 19:13-15, Govt. Exs. G, H, R, S, T.  Even if, as Bedrosian testified, Bedrosian considered his two accounts as a single account, Bedrosian **knew** he had an account ending in 6167 and that the account had over $1,000,000 in it.  *See e.g.*, Trial Tr. 90: 14-21 (Q: Your UBS accounts had more than $10,000 in them in 2007.  A: Oh, absolutely.  Yes.  Q: In fact, you knew that your 6167 account had over 1 million dollars in it? A: I'm sorry, you keep confusing me with the account number, but a 236.167, yes, had over a million dollars in it.  **That was the main account**.) (emphasis added).

## B.  Handelman Prepares Bedrosian's Federal Income Tax Returns - 1973-2007.

From approximately 1973 to 2007, Bedrosian used the services of accountant Seymour Handelman to prepare his income tax returns.  *Bedrosian*, 912 F.3d at 147.  When Bedrosian first started using Handelman to prepare his returns, Bedrosian did not mention his UBS account.  Trial Tr. 49:11-25, 50:19-23; 49:23-25, 50:1-7, 93:14-22.  As mentioned above, in the 1990s, Bedrosian saw a Wall Street Journal article about the federal government tracing mail from Switzerland through postage meter numbers.  *Id*.  Bedrosian, apparently worried about what he had read about secret foreign accounts being discovered by the government, then brought up the fact that he owned foreign accounts to Handelman.  Trial Tr. 93:14-25.  Handelman informed him that "there's a box you're supposed to check on a tax return . . . that you have an overseas account," and that "you've been breaking the law for 20 years."  Trial Tr. 50: 6-23, 51:1-4.  According to Bedrosian, Handelman explained that, so long as he did not need the money, he could leave it to his estate to pay tax on the income when the money was repatriated.  Trial Tr. 50:25, 51:1-21, 76:18-24, 93:20-25, 94:1-10, 95:22-25, 96:1-24, 97:1-25, 98:1-24.  Bedrosian did

7

not get a second opinion about his failure to report his foreign accounts or the consequences of his continuing failure.  Trial Tr. 94: 19-24, 99:6-18, 100:1-6.

C. **Bedrosian Files a 2007 FBAR Disclosing Only His Smaller UBS Account; Closes his Accounts with Separate Letters, Transfers Money from his Smaller Account to the United States, and Transfers Money from his Larger Account to another Bank in Switzerland in an Attempt to Maintain its Secrecy.**

Handelman died in 2007, and Bedrosian began working with a new accountant, Sheldon Bransky.  Trial Tr. 52:6-10, 53:12-14, 101:17-19.  Bedrosian authorized Bransky to obtain his records from Handelman's offices and gave Bransky the same materials that he was accustomed to giving Handelman in prior years.  *Bedrosian*, 912 F.3d at 147.  In 2008, following a district court order enforcing a "John Doe" summons against UBS for account records of U.S. clients who may be committing tax fraud, *see* Dep't of Justice, Press Release, July 1, 2008, "Federal Judge Approves IRS Summons for UBS Swiss Bank Account Records,"[4]  UBS informed Bedrosian that he had 60 days to close his accounts.  *Bedrosian*, 2017 WL 4946433 at *1.  Around the same time in 2008, Bransky prepared Bedrosian's 2007 federal income tax return, reporting *for the first time* that Bedrosian had an account in Switzerland.  Trial Tr. 53:15-25, 54:1-9, Govt. Ex. M.  He also prepared a 2007 FBAR for Bedrosian, also reporting *for the first time* that Bedrosian had an account in Switzerland.  Trial Tr. 103:2-25, 104:1-2, Govt. Ex. L, pg. US243.  Bedrosian claims he did not review his 2007 tax return or the FBAR.  *Bedrosian*, 912 F.3d at 148.  Bedrosian did not report or pay tax on the income he earned from either UBS account on his 2007 return.  Pl. Ex. 9.  He claims he simply signed the forms and mailed them. Trial Tr. 55:14-25, 58:12-23.

---

[4] *Available at* https://www.justice.gov/archive/tax/txdv08584.htm.

Bedrosian's 2007 FBAR disclosed a single UBS account.  Govt. Ex. L, pg. US243.

Bedrosian listed only his newer 5316 account number, and stated that the maximum value of the

account was under $1,000,000.  Govt. Ex. L, pg. US243 (reproduced below for convenience,

emphasis added).  The account he identified on the FBAR had assets totaling approximately

$240,000, while the account that was omitted had assets totaling approximately $2 million.

*Bedrosian*, 912 F. 3d at 147.

Shortly after filing his first FBAR, and shortly after receiving a notice from UBS to close his accounts within 60 days, Bedrosian closed both of his UBS accounts, and named each account by number in his two separate letters.[5]  Govt. Exs. L, J, K.  Bedrosian directed UBS to transfer the funds from his 5316 account to a domestic bank account.  Govt. Ex. K.  This was the account that was disclosed on Bedrosian's 2007 FBAR.  Govt. Ex. L.  Bedrosian had approximately $240,000 in this account.  *Bedrosian*, 912 F. 3d at 147.  Since the funds were deposited in a U.S. bank, their existence would have become known to the Service as soon as the U.S. bank issued a Form 1099 at the close of the year.  *Fla. Bankers Ass'n v. United States Dep't of Treasury*, 19 F. Supp. 3d 111, 114–15 (D.D.C. 2014), *vacated sub nom. Fla. Bankers Ass'n v. U.S. Dep't of the Treasury*, 799 F.3d 1065 (D.C. Cir. 2015) ("For some time now, banks have been required to report interest earned by U.S. citizens and residents. *See* 26 U.S.C. § 6049; Form 1099–INT.").

Bedrosian also directed UBS to transfer the funds from his 6167 account to another Swiss bank named Hyposwiss.  Govt. Ex. J.  At the time of the transfer, the account balance had declined to approximately $1.4 million.  Trial Tr. 19:13-15, Govt. Ex. T.  The transfer was accomplished with the help of his prior UBS banker.  Trial Tr. 46:4-12, 91:3-15, 92:2-25, 93:1-4, Govt. Exs. J, K.  These funds, still in Switzerland, were not disclosed on Bedrosian's FBAR for 2007.  Govt. Ex. L, pg. US243.  A year later, Bedrosian again did not disclose this Hyposwiss account on his 2008 FBAR.  Govt. Ex. L, pg. US244.

---

[5] Bedrosian filed his 2007 FBAR on October 14, 2008.  Govt. Ex. L.  Two weeks later, Bedrosian closed his larger, 6167 account on November 5, 2008.   Govt. Ex. J. A month and a half later, Bedrosian closed his smaller 5316 account on December 2, 2008.  Govt. Ex. K.

Once Bedrosian learned that UBS would be disclosing the existence of his 6167 account

to the Service, Bedrosian filed amended tax returns and FBARs going back to 2003, and applied

for a voluntary disclosure program to try to receive a reduced penalty and avoid criminal

prosecution.[6]   Trial Tr. 65:6-15, 68:1-6, 71:4-16, 105:3-25, 106:1-25, 107:1-22, 113:15-25,

114:1-2; Govt. Ex. O.   On September 9, 2010, Bedrosian sent a letter to the IRS regarding his

participation in the voluntary disclosure program, stating that "Originally, [he] was under the

impression that [his] name was not on the list to be provided to the IRS by UBS.   However, I was

advised recently that the IRS will be notified by UBS."   Govt. Ex. O, P-00400.   He was denied

acceptance into the voluntary disclosure program.   Trial Tr. 72:15-18, 109:17-25.[7]   UBS account

holders otherwise eligible for the voluntary disclosure program became ineligible for the

voluntary disclosure program "at the time the IRS receives information from any source,

including from the Swiss Federal Tax Administration ("SFTA"), UBS, an informant, or

otherwise, relating specifically to the account holder's undisclosed foreign accounts or

undisclosed foreign entities."   *IRS Voluntary Disclosure: Questions and Answers*,

---

[6] Bedrosian claimed at trial that he consulted an attorney at the end of 2008 or beginning
of 2009 about his UBS accounts, and that he followed a tax attorney's advice to come clean and
amend his tax returns.   However, Bedrosian filed an FBAR for 2008 on or about October 9,
2009, again disclosing only the smaller of his two UBS accounts (the one he transferred back to
the U.S. in mid-2008).   Govt. Ex. L.   It was not until June of 2010 that Bedrosian disclosed his
other, larger account on his 2009 FBAR.   It was not until between August and October 2010 that
Bedrosian filed FBARs for 2003 through 2006, as well as revised FBARs for 2007 and 2008,
filed amended returns for 2006 through 2008, and finally reported all of his foreign accounts and
the income he earned from those accounts to the Service.   Pl. Exs. 14, 17, 19-21, 23, 15-16, 18.

[7] *See Maze v. Internal Revenue Service*, 206 F. Supp. 3, 1 (D.D.C. 2016), for a general
description of the "family" of voluntary disclosure programs. *See also, IRS Voluntary
Disclosure: Questions and Answers*, https://www.irs.gov/newsroom/voluntary-disclosure-
questions-and-answers.

https://www.irs.gov/newsroom/voluntary-disclosure-questions-and-answers - Q. & A. 52.

(question and answer added January 8, 2010).

III.   **ARGUMENT**

   A.   **Bedrosian's Failure to Report his Approximately $2 million Account was, at a Minimum, Reckless as a Matter of Law.**

"While 'the term recklessness is not self-defining,' the common law has generally understood it in the sphere of civil liability as conduct violating an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.' " *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007) (*quoting Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). Finally, in terms of the type of evidence capable of establishing willfulness, the government can meet its burden "through inference from conduct meant to conceal or mislead sources of income or other financial information," and may use "circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available." *McBride*, 908 F. Supp. 2d at 1205 (*quoting United States v. Sturman*, 951 F.2d 1466, 1476-77 (6th Cir. 1991)).

*Bedrosian*, 2017 WL 4946433 at *4.  Recklessness is an objective standard that looks to whether conduct entails an unjustifiably high risk of harm that is either known or so obvious that it should be known.  *Bedrosian*, 912 F.3d at 153; *Norman v. United States*, 138 Fed. Cl. 189 (Ct. Fed. Cl. 2018), *appeal docketed*, No. 18-2408 (Fed. Cir. Sept. 18, 2018) (determining schoolteacher was willful after finding she signed documents to open a numbered bank account, waived her right to invest in U.S. securities, had numerous yearly contacts with UBS, and that she was at a minimum put on inquiry notice of the FBAR requirement); *Kimble v. United States*, 141 Fed. Cl. 373 (Fed. Cl. 2018) (determining individual was willful after finding that she did not disclose the existence of her foreign account to her accountant for years, never asked her accountant how to properly report foreign investment income, met with UBS representatives in New York, and did not review her individual income tax returns for accuracy); *United States v. Horowitz*, No. PWG-16-1997, 2019 WL 265107, at *3 (D. Md. Jan. 18, 2019), *appeal docketed*,

No. 19-1280 (4th Cir. April 14, 2019) (finding husband and wife were willful during certain tax years because by signing tax return they declared under penalty of perjurty that they examined the return and accompanying schedules and statements and that, to the best of their knowledge the return was true, accurate, and complete; consequently, husband and wife were charged with knowledge of the reporting instructions, both to check the box indicating a foreign account on the tax return and to file an FBAR).

When evaluating whether or not a person was willful with respect to the failure to file an FBAR, the Third Circuit found that a court must consider whether an individual 1) clearly ought to have known that 2) there was a grave risk the filing requirement (to file an accurate FBAR) was not being met, and if 3) the individual was in a position to find out for certain very easily. *Bedrosian*, 912 F. 3d at 153; *see also Norman*, 138 Fed. Cl. at 194 (noting that in addition to concealing her financial information, individual also failed to pursue knowledge of her reporting requirements – "Although she may not be a 'sophisticated individual in financial matters,' Trial Tr. 108:13-16, the Court cannot believe that Ms. Norman, a schoolteacher of at least 7 subjects including economics and government over a 40 year career, Trial Tr. 20:1-17, could do all of this account management over the course of a decade for an account with a large sum of money in it, without once reading any documents, and without realizing that the account had tax implications. Indeed, '[a]t a minimum,' Ms. Norman was 'put on inquiry notice of the FBAR requirement' when she signed her tax return for 2007, but she chose not to seek more information about the reporting requirements. (citation and footnote omitted)).

### 1. Bedrosian recklessly failed to ensure the accuracy of his 2007 FBAR reporting his secret Swiss bank account for the first time.

The testimony and documents, as well as the inferences to be drawn from the testimony and documents, establish that Bedrosian took a calculated risk in not reporting his UBS account

ending in 6167, which contained a gross amount of approximately $2 million in June of 2007.[8]

In failing to review his 2007 FBAR for accuracy before signing under penalty of perjury that the

information disclosed was correct, he took a calculated risk that the form was accurate and that

the Service would not discover that he reported only a smaller, soon-to-be-repatriated account.

By the time Bedrosian signed the 2007 FBAR, he had *actual knowledge* of the obligation to fully

and truthfully report his until-then-secret offshore accounts.

     a.  <u>A taxpayer who signs a tax return is charged with constructive knowledge of its contents.</u>

A taxpayer who signs a tax return or an FBAR cannot claim innocence for not having

actually read the return, as he is charged with constructive knowledge of its contents. Courts

have repeatedly held that people who sign legal documents without reading them are charged

with knowledge of the contents, whether read or not.  *United States v. Williams*, 489 Fed. App'x

655, 659 (4th Cir. 2012); *Horowitz*, 2019 WL 265107 at *3; *see also*, *Greer v. Commissioner of

Internal Revenue*, 595 F.3d 338, 347 n. 4 (6th Cir. 2010); *United States v. Doherty*, 233 F.3d

1275, 1282 n. 10 (11th Cir. 2000); *United States v. Mohney*, 949 F.2d 1397, 1407 (6th Cir.

1991); *Jarnagin v. United States*, 134 Fed.Cl. 368, 375 (Fed. Cl. 2017) ("A taxpayer who signs a

tax return will not be heard to claim innocence for not having actually read the return, as he or

she is charged with constructive knowledge of its contents."); *Novitsky v. Am. Consulting Engr's,

LLC*, 196 F.3d 699, 702 (7th Cir. 1999) (explaining that arguments blaming accountants for

inaccurate tax returns are not effective, because "[p]eople are free to sign legal documents

---

    [8] The parties do not dispute that Bedrosian meets all requirements of the relevant reporting laws, and so the United States does not address them here.  *Bedrosian v. United States*, No. 15-5853, 2017 WL 4946433 at *3 (E.D. Pa. Sept. 20, 2017).

without reading them, but the documents are binding whether read or not"); *Katz v. United States*, 321 F.2d 7, 10 (1st Cir. 1963) (stating that a return is not less inaccurate because the taxpayer chose to be uninformed as to the extent that the return is inaccurate).

Even if Bedrosian did not read a one-page document with two main parts titled "Report of Foreign Bank and Financial Accounts [] Do NOT file with your Federal Tax Return," and "Information on Financial Accounts," *see supra* p. 9, which he characterized at trial as a "simple form," (*see* Trial Tr. 102:22-25), he is bound by his signature on that document.  And, even if this Court could not conclude that Bedrosian clearly knew that his 2007 FBAR was inaccurate and that he *knowingly* omitted his 6167 account, *Bedrosian*, 2017 WL 4946433 at *5, Bedrosian's conduct was, at a minimum, reckless.

Even if the Court were to credit his testimony, that he signed the FBAR without reading it, he is responsible for its errors, including errors of omission.  As demonstrated by Govt. Ex. L, *supra* p. 9, the FBAR is a single page, Bedrosian's signature appears immediately below (and within the field of vision) of three crucial errors: (i) the account number, (ii) the account balance, and (iii) the total number of foreign accounts reported.  Signing an FBAR without checking it for accuracy, especially when Bedrosian was reporting an until-then-secret Swiss bank account for the first time in the years since Handelman told him he was violating the law in not reporting it, is reckless and not merely negligent.  Signing an FBAR without checking it for accuracy, especially when it was the first time a new accountant, Bransky, was preparing Bedrosian's tax returns, is reckless and not merely negligent.  Bedrosian could have checked the 2007 FBAR for accuracy: he could easily have obtained account statements for both the 6167 and the 5316 accounts, and he regularly checked in with his bankers because he was worried about them stealing his money or making bad investments.  Bedrosian clearly ought to have known that there

15

was a grave risk that the FBAR was inaccurate, and he was in a position to find out very easily

that the FBAR was inaccurate. *Bedrosian*, 912 F.3d at 153.

> b. <u>Bedrosian knew he had two Swiss accounts, took steps to conceal those accounts, and reported each of them only when he thought the account would be discovered by the United States.</u>

An improper motive – like an intent to commit tax fraud, bankruptcy fraud, a carefully

planned tax evasion scheme, or an intent to evade tax – is not required for a court to find a

taxpayer's failure to comply with reporting requirements to be willful.  *Bedrosian*, 912 F. 3d at

153 (subjective motivations and overall "egregiousness" of conduct are not required to establish

willfulness).  All that is required to establish willfulness is conduct that is voluntary, rather than

accidental or unconscious.  The fair inferences from the evidence demonstrates that Bedrosian's

conduct was voluntary. He knew he had two foreign accounts, he took steps to conceal his

accounts, and he reported each of his accounts only when he thought the account would be

discovered by the United States.

> i. *Bedrosian knew he had two foreign accounts.*

In 2005, Bedrosian decided to open a second account.  This second account was the 5316

account.  UBS records detailing communications with Bedrosian show that he communicated

with UBS at least five times a year and frequently directed investment activities.  Govt.  Ex. I.

Bedrosian stated that he "didn't like the idea of giving someone control of his money" and was

concerned that the bank would "lose it all or steal it all or made [sic] bad investments."  Trial Tr.

87:9-18.  It is fair to infer that he was aware that he had more than one account and that he was

aware his accounts contained more than $1,000,000.  It is also fair to infer that Bedrosian used

his account numbers when communicating with UBS, and knew his two account numbers, as

evidenced by the two letters he wrote, one for 5316 and one for 6167, shortly after filing his 2007 FBAR, closing his UBS accounts.

*ii. Bedrosian took steps to conceal his Swiss bank accounts.*

Bedrosian took steps to conceal his foreign accounts. In a Wall Street Journal article in the early 1990s, it was reported that the government was looking at foreign postmarks to discover unreported offshore accounts. Around the same time, Bedrosian decided to sign a direction to the bank (another one-page document) to, in effect, not send any mail to him in the United States and agreed to pay a so-called "hold mail fee" so that UBS would not send account statements to him through the mail. Govt. Ex. F. Instead, he oversaw his accounts with phone contacts and in-person meetings with UBS bankers, in an apparent attempt to avoid a paper trail that the Service could discover by looking at postmarks.[9] Govt. Ex. I.

*iii. Bedrosian reported each of his accounts only when he thought the account would be discovered by the United States.*

In 2008, shortly before the 2007 FBAR was filed, the Service issued a John Doe summons to UBS. UBS sent a letter to Bedrosian instructing him to close his accounts. Bedrosian then filedhis 2007 FBAR. When he filed the FBAR, the accounts were still open, and he could have checked with UBS to obtain accurate account information. Soon after filing the FBAR reporting only one account – the account with the smaller balance – Bedrosian instructed UBS to move the funds in that account to a U.S. bank. Consequently, the Service would have become aware of that account once the U.S. bank reported any interest or other income earned on

---

[9] Such decision-making dovetails with his decision not to report the accounts (and let his estate deal with it, thus avoiding criminal penalties) even after Handelman warned him he was breaking the law.

a Form 1099.  It is a fair inference that Bedrosian reported the smaller account ending in 5316 because he had already decided to repatriate those funds and thus knew the Service would be made aware of the account.

Bedrosian also decided to instruct UBS to move the funds in 6167 to a different Swiss bank.  It is a fair inference that Bedrosian intended to keep the new Swiss account hidden from the United States government by keeping those funds offshore, unaware that UBS would report the account even though Bedrosian closed it as instructed by UBS.  Again, this decision would be in keeping with the advice from Handelman to hide the offshore account until after he died, and would explain why Bedrosian left the account ending in 6167 containing over $1,000,000 off of his 2007 FBAR.

Bedrosian continued his attempt to hide the larger account the following year.  In 2009, he filed his FBAR for 2008, again asserting he had only a single account with a maximum value less than $100,000 (the account closed and repatriated during 2008), and again continuing to fail to report the larger account moved from UBS to Hyposwiss during 2008.  Govt. Ex. L, pg. US243 (2007 FBAR), *compare* pg. US244 (2008 FBAR dated October 2009 signed by Bedrosian and reporting one account at UBS containing less than $100,000) *with* US258 (amended 2008 FBAR dated October 2010 signed by Bedrosian and reporting two accounts containing values of $154,305 and $2,156,588, submitted in an apparent effort to participate in anthe IRS voluntary disclosure program).  The 2008 FBAR was filed in 2009, *after* Bedrosian wrote the two separate letters to UBS, repatriating the smaller 5316 account and moving the larger 6167 account to Hyposwiss.  Bedrosian waited to report his 6167 account until after he learned that UBS would disclose the 6167 account to the Service.  Govt. Ex. L, pg. US244.

      c. <u>Bedrosian clearly ought to have known that there was a grave risk that an accurate FBAR was not being filed, and was in a position to find out for certain very easily.</u>

Bedrosian had easy access to statements for each of his accounts, communicated with UBS by phone and email, and less than a month after he filed his 2007 FBAR, closed each of his two accounts and referred to each of them by number in each closing letter.  Bedrosian could have, but did not, check his bank statements and/or with his bank about his accounts before he filed his 2007 FBAR.  Nor did Bedrosian amend his 2007 FBAR after he sent two separate letters to UBS identifying two different accounts shortly after filing the FBAR. And, Bedrosian filed yet another FBAR for 2008 reporting only one account with a maximum value less than $100,000, and continuing to fail to report the larger account he maintained at Hyposwiss, months after he had closed his UBS accounts with two separate letters.

His failure to ensure the accuracy of his FBAR, after he knew his failure to report was illegal, when he could have easily discovered the facts, *Bedrosian*, 2017 WL 4946433 at *5, and correct his omission before or soon after filing (that is, failing to disclose the larger account, which became known to him (at the latest) when he wrote the closing letters to UBS within weeks after the of filing his 2007 FBAR, amounts to reckless disregard for the risk that his 2007 FBAR was inaccurate.  As discussed above, Bedrosian could very easily have found that there was a grave risk that an accurate FBAR was being filed – he just had to read the one-page form he signed and mailed.

Bedrosian not only risked filing an inaccurate FBAR by failing to read it, the fair inference from the evidence suggests that at the time he signed the 2007 FBAR in October 2008, Bedrosian took a "calculated risk," *Bedrosian*, 2017 WL 4946433 at *5, that the banks would not

report, and the Service would not discover, his larger 6167 account that he planned to move, and

weeks later did in fact move, to another Swiss bank in an effort to keep it secret.

Bedrosian appears to be claiming that his failure to report his $2 million account was an

accident or unconscious act – that he was, at the most, negligent.  Bedrosian was a highly

sophisticated CEO of a pharmaceutical company and knew that he was breaking the law by not

disclosing and paying tax on his UBS accounts.  He testified that he did not discuss the UBS

accounts with his new accountant, Bransky, and that Bransky completed the 2007 FBAR without

Bedrosian's help and simply gave the form to Bedrosian to sign and file.  Bedrosian could not

have mistaken the FBAR for part of his tax return, because the FBAR is mailed separately to a

different address.  *GSee ovt*. Ex. L, pg. US243.

Bedrosian also claims that he believed the information reported on his 2007 FBAR was

accurate when he signed it, even though he testified that he did not read the FBAR before signing

it.  He cannot have it both ways.  If Bedrosian read the FBAR, then he saw only one account

reported and took no steps to confirm the information and correct any inaccuracies, which he

could have very easily done.  If he did not read it, then he took a risk that the informaiton was

not accurate.  Either way, when submitting an FBAR disclosing an until-then-secret offshore

account for the first time, he took a grave risk that an accurate FBAR was not being filed.  This

was not a form his accountant prepared for him for many years that was always accurate in the

past, where an small error might have been overlooked before signing.  The 2007 FBAR was the

first time any accountant had prepared such a form for Bedrosian, it was prepared by a new

accountant after his long-time accountant passed away, and it was the first time he was

disclosing to the IRS the existence of an offshore account (knowing that his prior conduct

keeping the foreign accounts secret was illegal).  Whether Bedrosian reviewed the 2007 FBAR

before he mailed it in, knowing that a failure to report foreign bank accounts was against the law, and being in a position to easily determine his FBAR was incorrect – his actions were at a minimum reckless.[10]

### B. Bedrosian's Subsequent Disclosures do not Negate His Recklessness when he Filed his 2007 FBAR.

Bedrosian's 2010 amendments to his 2007 FBAR do not mitigate his reckless failure to file an accurate 2007 FBAR in the first place.[11]  This Court observed that Bedrosian consulted his lawyers in late 2008, and "[f]rom that point forward, Bedrosian heeded the advice of counsel, amended his returns, and paid taxes on the gains from his Swiss accounts."  *Bedrosian*, 2017 WL 4946433 at *2.  The record does not fully support this observation.  Bedrosian's full compliance was not forthcoming for two years, when he filed an amended 2007 FBAR as part of his application into the voluntary disclosure program with the hope of limiting his potential criminal and civil liability.  On September 9, 2010, Bedrosian sent a letter to the Service regarding his participation in the voluntary disclosure program, stating that "Originally, [he] was under the impression that [his] name was not on the list to be provided to the IRS by UBS.  However, I was

---

[10] Moreover, for all the reasons set forth here and in the United States' prior filings in this matter, the United States submits that Bedrosian's actions were done with knowledge that his 2007 FBAR was inaccurate; the Court's findings that Bedrosian lacked knowledge is clearly erroneous.

[11] Subsequent cooperative behavior does not negate willfulness for the year at issue.  *In re Meyers*, 196 F.3d 622, 625 (6th Cir. 1999) (rejecting a taxpayer's claim that willfulness was "somehow nullified by later coming clean with the IRS").  Similarly, a taxpayer cannot purge fraud on a tax return by a subsequent voluntary disclosure because the violation was completed when the original return was completed and filed.  *Badaracco v. Commissioner*, 464 U.S. 386, 394 (1984).  To hold otherwise would allow taxpayers to make a sport of the civil fraud penalty by taking the chance that the misconduct would not be discovered.  *Id.*

advised recently that the IRS will be notified by UBS." Ex. O, P-00400.[12]

Like his 2007 FBAR, Bedrosian's 2008 FBAR, filed in October 2009, did not disclose his larger UBS account – even though by the time he filed the 2008 FBAR in October 2009, Bedrosian had written two separate letters closing the two accounts, moving funds in the smaller account to a U.S. bank and moving funds from the larger account to another Swiss bank.   Gov't Ex. L; Pl.'s Ex. 11.   Continuing to hide his larger, still secret, account in 2009 (when he filed his 2008 FBAR), after allegedly having consulted with counsel in 2008, does not mitigate his recklessness in filing an inaccurate 2007 FBAR.  Rather, it doubles down on his recklessness.

It was not until 2010, when Bedrosian learned that UBS provided or was about to provide his account information to the IRS and he could no longer conceal the existence of the larger 6167 account, that he finally implemented his counsel's advice to amend his 2007 and 2008 FBARs, file FBARs for prior years, and amend his tax returns.  At that time, Bedrosian applied for the IRS's voluntary disclosure program in the hopes of avoiding criminal prosecution and receiving the penalties.  Ex. O.  It is a fair inference that his decision to disclose in 2010 was motivated by the knowledge his accounts were no longer secret and a desire to obtain some relief from liability.  "Coming clean" was the cost of relief from criminal liability and to pay a lesser civil penalty.  *See Bedrosian*, 2017 WL 4946433 at *2.   But participation in the voluntary disclosure program was conditioned on coming clean *before* the IRS otherwise learned of the secret accounts.  For Bedrosian, his attempt to come clean was too late, as UBS had already

---

[12] At trial Bedrosian claimed that the information contained in his submission to the Service was a "mischaracterization," of what he meant, although he does not deny making the statement.  Trial Tr. 108: 2-25.  The statement is clear and it is hard to glean what else he could have meant.  Moreover, the other evidence described in this memorandum supports and conforms with the plain meaning of the statement as written.

disclosed his accounts to the Service.  His eventual disclosures and amended 2007 FBAR do not mitigate his reckless filing of the original 2007 FBAR.

### C.   The Amount of the FBAR Penalty Assessment was Proper.

This Court, having concluded that Bedrosian did not willfully fail to file an accurate 2007 FBAR, declined to rule on the penalty amount.  *Bedrosian*, 2017 WL 4946433 at *5.  The United States submits that the amount of the penalty assessed against Bedrosian was proper.

#### 1.   The statutory penalty is $100,000 or 50% of the balance of the unreported account, whichever is greater.

Congress set the maximum penalty for willful violations of the FBAR reporting requirements at the greater of $100,000 or 50% of the bank account balance at the time of the violation.  31 U.S.C. § 5321(a)(5)(C), (D).  The Secretary of the Treasury has discretion to impose a penalty in an amount up to this statutory ceiling.[13]   *See* 31 U.S.C. § 5321(a)(5)(A); *Bedrosian,* 912 F.3d at 147; *see also United States v. Garrity*, 2019 WL 1004584, (D. Conn. February 28, 2019); *Norman*, 138 Fed. Cl. at 195–96; *Kimble*, 2018 WL 6816546 at *15;

---

[13] Congress effectively abrogated a limiting regulation capping FBAR penalties at $100,000 when it increased the maximum penalty by statute in 2004.  *United States v. Garrity*, 2019 WL 1004584, (D. Conn. February 28, 2019); *Norman v. United States*, 138 Fed. Cl. 189, 195–96 (2018); *Kimble v. United States*, No. 17-421, 2018 WL 6816546, at *15 (Fed. Cl. Dec. 27, 2018); *United States v. Horowitz*, No. PWG-16-1997, 2019 WL 265107, at *3 (D. Md. Jan. 18, 2019); *but see United States v. Colliot*, No. AU-16-CA-01281-SS, 2018 WL 2271381, at *3 (W.D. Tex. May 16, 2018); *United States v. Wahdan*, 325 F. Supp. 3d 1136, 1139 (D. Colo. Jul 18, 2018).  Until 2004, the maximum FBAR penalty was $100,000. *See* 31 U.S.C. § 5321(a)(5) (1996-2004). In 2004, Congress amended § 5321 explicitly providing that "the maximum penalty" in the case of a willful violation "**shall be increased** to the greater of—(I) $100,000, or (II) 50 percent of the amount" of the foreign account balance. 31 U.S.C. § 5321(a)(5)(C) (emphasis added).  The amendment both: (1) discarded the $100,000 upper limit in the earlier statute, and (2) used half of the account balance (rather than the entire balance) as a factor in determining the maximum penalty.  *Id.*  Congress explicitly increased the penalty ceilings for willful FBAR violations in the 2004 Jobs Act to encourage individuals to report foreign financial accounts, in response to testimony about persistent noncompliance with the filing requirement.

*Horowitz*, 2019 WL 265107, at *3, *but see United States v. Colliot*, No. AU-16-CA-01281-SS,

2018 WL 2271381, at *3 (W.D. Tex. May 16, 2018); *United States v. Wahdan*, 325 F. Supp. 3d

1136, 1139 (D. Colo. Jul 18, 2018).

In calculating the penalty amount, the Service looked to the account balance in U.S.

dollars as of June 30, 2008, the date the 2007 FBAR was due, *i.e.*, the date of violation.[14]  The

Service looked to the monthly account balances provided by UBS pursuant to a treaty request.

The monthly account balance in his 6167 account ending June 30, 2008 was $1,951,578.34.

Govt. Ex. T.  The penalty is 50% of the June 30, 2008 balance of $1,951,578.34, for a total

penalty of $975,789.17.

### 2.     Bedrosian did not qualify for a reduced penalty.

The Service has informal, nonbinding, guidance for examiners in determining the

amount of the penalty and to determine whether a penalty lower than the statutory maximum

should be imposed.  I.R.M. 4.26.16.4.6.1, 2008 WL 5900937 (July 1, 2008); I.R.M.

4.26.16.4.6.3, 2008 WL 5900939 (July 1, 2008); *Keller v. Commissioner*, 568 F.3d 710, 720-721

(9th Cir. 2009) (noting that the Internal Revenue Manual does not have the force of law). The

guidance is set forth in the Internal Revenue Manual, which provides a two-step process for

examiners to determine if a penalty lower than the statutory maximum could apply.  *See* I.R.M.

4.26.16.4.6.1, 2008 WL 5900937 (July 1, 2008) (providing that a lower penalty *might* apply

depending on the individual's ability to meet threshold requirements *and* the balance of the

---

[14] The account balance during and at the end of 2007 was approximately $2.3 million.
Govt. Ex. H.  Using the end of the year balance would have resulted in an even greater penalty
amount.

foreign bank accounts) (emphasis added); I.R.M. 4.26.16.4.6.3, 2008 WL 5900939 (July 1, 2008).

The first step involves applying four threshold conditions.  *See* I.R.M. 4.26.16.4.6.1.[15]  If those conditions are met, a tiered analysis is applied to determine the amount of the penalty.  *Id.* Even if a taxpayer meets all of the threshold conditions, the maximum penalty *still applies* where the taxpayer's foreign account had a sufficiently high balance, over $1 million.  I.R.M. 4.26.16.4.6.3, 2008 WL 5900939 (July 1, 2008) ("Level IV Willful Violations Occurring After October 22, 2004 - *If the maximum account balance to which the violations relate at any time during the calendar year exceeded $1 million*, Level IV, the statutory maximum applies to that account.  The Level IV penalty is the statutory maximum applied to each account.  It is the greater of $100,000 or 50% of the closing balance in the account as of the last day for filing the FBAR.") (emphasis added).

After applying the mitigation guidelines to this case, the maximum penalty would still be applicable for Bedrosian's failure to report his UBS account ending in 6167.  In June of 2008, Bedrosian's account contained $1,951,578.34.  Govt. Ex. T.  Bedrosian therefore did not qualify for a reduced penalty under the Service's mitigation guidelines.  I.R.M. 4.26.16.4.6.3, 2008 WL 5900939 (July 1, 2008).  The maximum penalty for willful violations of the reporting requirements – when an account has a balance of over $1 million – is the greater of $100,000 or

---

[15]  The threshold conditions are as follows: 1) the taxpayer has no history of FBAR penalty assessments or criminal tax or BSA convictions; 2) the funds in the accounts were not from an illegal source or used to fund a criminal purpose; 3) the taxpayer cooperated during the examination; and 4) the Service did not assess a civil fraud penalty against the taxpayer with respect to the income attributable to a foreign account.  I.R.M. 4.26.16.4.6.1, 2008 WL 5900937 (July 1, 2008).  The United States does not dispute that Bedrosian met the four threshold conditions.

fifty percent of the bank account balance at the time of the violation.  31 U.S.C. § 5321(a)(5)(D).

Because fifty percent of the balance of Bedrosian's account ending in 6167 was over $100,000,

the Service assessed a penalty in the amount of $975,789.17, or fifty percent of the account

balance as of June 2008.[16]  Thus, the amount of the penalty assessed against Mr. Bedrosian was

proper under section 5321.

Bedrosian attempts to limit any penalties by stating that UBS gave him a loan and that

taking the loan into account, his account balance was reduced to less than $1 million.  The

documents, and simple arithmetic, refute Bedrosian's claim.  First, UBS records indicate that

even if the borrowed funds were excluded, the account contained over $1,000,000.  The account

statement ending December 31, 2007 show both the gross account value, approximately $2.3

million, and the net account value after backing out a loan as $1,667,721.  Govt. Ex. H.  The

same set of bank statements shows the loan account as subaccount 9999, and the amount of the

liability to UBS as $662,456.  *Id.*

---

[16] At trial, for the first time, Bedrosian contested the calculation of the FBAR penalty
imposed against him.  He argued that he had explicitly contested the penalty amount in his
previous filings.  Trial Tr. 136:22-25, 137:1-3.  However, Bedrosian acknowledged that the
penalty imposed against him equaled 50% of his bank account balance.  Docket No. 22-3, ¶ 51
("The penalty amount was calculated as 50% of Bedrosian's bank account balance for the
account ending in 6167, or fifty percent of $1,951,578.34, which equals $975,789.17"); Docket
No. 26-1, ¶ 51 ("Admitted"); Docket No. 25-1, ¶ 36 ("The maximum value of the account was
$1,951,578.34, and the amount of the penalty was $975,789.19 – half the value of the account
and the highest penalty that could be imposed"); *see also* Docket No. 49, pg. 5; Docket No. 31,
pg. 4 (finding that the penalty the Service assessed against Bedrosian was equal to 50% of the
maximum value of the account and was the highest authorized penalty); Tr. 19:13-16 ("Now the
government states and we concede that at the time there was about 2 million U.S. dollars in that
account, give or take").

Second, there is no exclusion for borrowed funds in a foreign offshore account when filing an FBAR. The FBAR requires that the account balance be reported within a range, *i.e.*, $100,000 to $1,000,000, and more than $1,000,000. And since the FBAR does not impose a tax, but is only a reporting mechanism, there is no logical reason to exclude borrowed funds from the reported balance. Likewise, there is no logical basis to exclude borrowed funds under an account owner's dominion and control from the calculation of the penalty since those funds were at his disposal during the year. In filing an FBAR, Bedrosian was not reporting taxable gain, as he did on stock sales on his federal tax returns, so there is no reason to report only the net asset value.

### 3.  Bedrosian Owes Interest and a Late-Payment Penalty for his Failure to Pay the FBAR Penalty.

Title 31 of the United States Code provides for the accrual of interest on debts owed to the United States. 31 U.S.C. § 3717(a)(1). Interest begins to accrue from the date that notice of the amount due is first mailed to the person who owes the debt. 31 U.S.C. § 3717(a)(2)(b). In addition, a late-payment penalty must be assessed for the part of the debt that remains unpaid after 90 days. 31 U.S.C. § 3717(e)(2). The late-payment penalty is capped at six percent per year. *Id*.

The Service mailed notice of the amount due to Bedrosian on January 30, 2015. Govt. Ex. B. Under section 3717, interest begins to accrue on that date. 31 U.S.C. § 3717(a)(2)(b). From January 30, 2015 to September 10, 2015, interest accrued in the amount of $5,902. Govt. Ex. D. Interest continues to accrue until the FBAR penalty is paid in full.

Section 3717 also provides that a penalty applies to the portion of a debt that has not been paid after 90 days. Bedrosian made one payment in the approximate amount of $9,500, which is reflected in the statement of the amount due. *See* Govt. Ex. D. The late-payment penalty applies

until Bedrosian fully pays the FBAR penalty assessed against him.  As of September 10, 2015,

the amount of the penalty was $35,412.  Govt. Ex. D.  The total amount owed, including the

FBAR penalty, interest, and the late-payment penalty, is $1,007,345.48 as of September 10,

2015, plus statutory additions accruing after that date.  Govt. Ex. C.

IV.    **CONCLUSION**

This Court has already found uncontradicted evidence of, at a minimum, recklessness.

Bedrosian did not review a single-page FBAR form.  Had he glanced up from the place where he

put his signature, Bedrosian could have very easily determined that his FBAR form was not

accurate.  His accountant had already told him that his failure to report his foreign bank accounts

was against the law.  He had information available, such as access to bank statements, emails,

and other correspondence that made it clear his FBAR was not accurate and he could have easily

obtained additional accurate information with a phone call to his UBS banker.  He took steps to

keep his offshore accounts secret, and when confronted with the possibility of disclosure, he

chose to keep the larger of two accounts offshore and secret.  He worked with his UBS banker to

move the larger account to another Swiss bank. He corrected his inaccurate report only after he

learned that the information was or soon would be given to the Service.

The totality of the evidence and the inferences that can be drawn from that evidence

demonstrate that, at a minimum, Bedrosian decided to take a calculated risk and act with reckless

disregard for whether his 2007 FBAR was accurate.  The United States is entitled to a judgment

against Bedrosian in the amount of $1,007,345.48 as of September 10, 2015, plus statutory

additions accruing after that date, until the judgment is satisfied.

DATE:          March 15, 2019          RICHARD E. ZUCKERMAN
                                        Principal Deputy Assistant Attorney General

                                        /s/Kavitha Bondada
                                        KAVITHA BONDADA
                                        Trial Attorney, Tax Division
                                        United States Department of Justice
                                        Post Office Box 227
                                        Ben Franklin Station
                                        Washington, D.C.  20044
                                        Telephone: 202.307.6536
                                        Fax: 202.514.6866
                                        Email: kavitha.bondada@usdoj.gov
                                        *Counsel for the United States*

CERTIFICATE OF SERVICE

I certify that the foregoing *United States' Supplemental Briefing* was filed on March 15,

2019 through the Court's CM/ECF filing system, which will automatically send a copy to the

following:

Patrick Egan
Beth Weisser
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, Pennsylvania 19103
*Counsel for the Plaintiff*

                                        /s/Kavitha Bondada
                                        KAVITHA BONDADA