IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARTHUR BEDROSIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:15-cv-05853 |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## UNITED STATES' REPLY

The record evidence, including the testimony and documents, as well as the reasonable

inferences drawn from that evidence, demonstrates Arthur Bedrosian's recklessness when he

failed to report the larger of his two foreign accounts on his 2007 FBAR.  In his response to the

United States' Supplemental Briefing on remand, Bedrosian argues there was no purpose to the

Third Circuit's remand; citations to letters signed and statements Bedrosian made are

"mischaracterizations" of the record or "new" evidence.   Bedrosian also argues that a person

cannot be both credible and reckless simultaneously; that the Court already determined he was

credible, and therefore, he cannot be reckless. [1]

Even if Bedrosian is credible, Bedrosian was reckless and liable for the assessed penalty.

The question before this Court on remand is an objective one – whether Bedrosian 1) clearly

ought to have known that 2) there was a grave risk his FBAR filing requirement was not being

met, and if 3) Bedrosian was in a position to find out for certain very easily.  *See Bedrosian v.*

---

[1] Bedrosian claims the United States conceded he was credible at trial.  (Doc. No. 76, p. 9.)  This statement is incorrect.  The United States explained to the Court that Bedrosian's testimony was *inconsistent*.  Trial. Tr. 153:13-25.

1

*United States*, 912 F.3d 144, 153 (3d. Cir. 2018); (*see also* Doc. No. 76, p. 12-13) (listing FBAR cases).  The record contains undisputed evidence that Bedrosian took an unjustifiable risk in filing his 2007 FBAR that it was incorrect.  (*See* Doc. No. 75, p. 5-11.)  The United States' contention that it met its burden under the civil standard of willfulness by demonstrating that Bedrosian was reckless is not an attack on this Court's credibility determination.  The conclusion is support by the undisputed evidence, and the reasonable inferences drawn from that evidence.

In this case, Bedrosian 1) knew his failure to report his foreign bank accounts violated the law because his accountant told him it was against the law, 2) the first time he filed an FBAR, he did not review it, and merely signed the one-page form and mailed it, and 3) as his correspondence to UBS demonstrates, he could have found out for certain very easily that his FBAR was not accurate just by reading the one-page form he was signing and mailing.  Indeed, there were three inaccuracies on the first FBAR (a one-page document) Bedrosian was filing after decades of not reporting his Swiss bank accounts or the taxable income earned on those accounts.  Bedrosian:

a) inaccurately reported the number of foreign accounts he held,

b) inaccurately reported he had less than $1 million dollars in the accounts when in reality he had approximately *twice* that amount in his accounts, and

c) inaccurately reported his account numbers by omitting the account he later claimed was his main account (which, coincidentally, was the account he did not repatriate).

Bedrosian could have identified these inaccuracies just by looking at the page; he also could have consulted information accessible to him, including communicating UBS.   His failure to do so was reckless, and he is liable for the penalty the assessed against him.

The Court can determine the penalty amount from the evidence in the record. Bedrosian's challenge to some of that evidence is precluded by his previous admissions that the assessment amount was calculated as 50% of the account balance and by his failure to timely object to Exhibit R.  Moreover, Exhibit R was authenticated as a business record and is not inadmissible hearsay.  Once the account balance is established, the calculation is simple math: 50% of the balance.

I.     **ARGUMENT**

    A.  <u>**The Third Circuit Remand Requires More Than A Rewording of the Opinion.**</u>

As demonstrated in the United States' opening supplemental memorandum, the evidence and reasonable inferences from that evidence demonstrate that Bedrosian "(1) clearly ought to have known that (2) there was a grave risk that [an accurate FBAR was not being filed] and if (3) he was in a position to find out for certain very easily." *Bedrosian*, 912 F. 3d at 153.  Bedrosian argues in his response that this Court must merely reword its earlier opinion and restate its previous conclusion.  (Pl.'s Resp. to United States' Suppl. Br., Doc. No. 76, p. 3.)  The Third Circuit, however, was unsure whether this Court "somehow misunderstood the operative nature of the [recklessness] inquiry." *Bedrosian*, 912 F.3d at 152.  The Third Circuit explained that the uncertainty arose from this Court's focus on a) Bedrosian's subjective motivations and b) the egregiousness of his conduct *in comparison* to the conduct of individuals involved in recent FBAR cases. *Id.* at 153.  Bedrosian doubles down on these points, urging that because the government did not show other wrongdoing, including a civil or criminal scheme to avoid taxation by Bedrosian, it should conclude that Bedrosian was not reckless when he filed his 2007 FBAR omitting his account 6167, the larger then un-repatriated account. (Doc. No. 76, p. 8). Bedrosian also argues that his cooperation in 2010, once he realized that UBS was going to

disclose to the United States his undisclosed account (moved to Hyposwiss in 2009)
demonstrates he was not reckless.[2]  Bedrosian's turnabout in reporting and cooperation with the
government *after* his counsel advised him that UBS would be or had already disclosed his
foreign accounts to the United States does not change the evidence and inferences at the time,
October 2008, he filed his initial and incorrect 2007 FBAR. (Doc. No. 75, p. 5-6.)

   **B.  <u>The Evidence Demonstrates Bedrosian was Reckless.</u>**

   Bedrosian's response brief dismisses the plethora of evidence that Bedrosian was
reckless.[3]  Bedrosian urges the Court to focus on certain testimony and ignore letters Bedrosian
signed and statements he made, calling the evidence and the reasonable inferences
"mischaracterizations" of the record or "new" evidence.

   First, Bedrosian asks the Court to continue to place great weight on the evidence that he
cooperated with the Service in 2010, suggesting that his later conduct "is inconsistent with either
intentional or reckless disregard of a known duty." (Doc. No. 76, p. 7.)  He points out that the
Service employees did not dispute this cooperation.  But his focus on cooperation *after* he was
exposed as having hidden foreign accounts is not relevant to the determination of whether he
acted recklessly when he filed his 2007 FBAR.  It is clear from the correspondence sent to the

---

   [2] This evidence shows that Bedrosian failed to report $221,022 of income earned on his
unreported 6167 account in 2007.  The unreported income was disclosed in his 2010 letter
submitted in connection with his attempt to participate in the Offshore Voluntary Disclosure
Program.  Govt. Ex. O.

   [3] Bedrosian argues that the United States has introduced new evidence on remand, but
fails to identify a single new fact presented in the United States' Supplemental Briefing.  (*See*
Doc. No. 76.)  All of the evidence cited in the United States' opening brief and in this reply was
before the Court at trial.

Service dated September 9, 2010, Govt. Ex. O, that Bedrosian believed UBS would be

identifying him to the United States as having undisclosed foreign accounts, as he wrote:

> Originally, I was under the impression that my name was not on the list to be
> provided to the IRS by UBS.  However, I was advised recently that the IRS will
> be notified by UBS.  The information provided below is based upon information
> provided by UBS and has not been substantiated.

*Id.*  It is telling that Bedrosian's response does not challenge this timeline.  Bedrosian omits from

his narrative that shortly after filing the 2007 FBAR he sent two letters to UBS, each letter

directing the closure of a particular account.  Only one of those accounts – the 5316 account he

disclosed on his FBAR – was reported and the funds repatriated.  The 6167 account was moved

to Hyposwiss, not reported on the 2007 FBAR, and the funds were not repatriated.  The evidence

and reasonable inferences from the timeline of events, including Bedrosian's filing an inaccurate

2007 FBAR, sending two separate letters to UBS shortly after the FBAR filing to close two

accounts, and cooperation after he learned UBS would expose his attempt to hide his foreign

accounts, supports the conclusion that Bedrosian acted recklessly when submitting the incorrect

2007 FBAR.

Second, Bedrosian claims that contrary to the United States' assertion, he did not request

UBS to stop sending him mail.  He points out that the request was "initiated" by UBS, and

argues that the United States' assertion is incorrect.  Bedrosian, however, does not dispute the

existence of the mail hold that he chose to put it in place (when offered by UBS), nor does he

dispute the mail hold form indicates he paid a fee for this benefit.  (*See* Doc. No. 76, p. 9.)  Even

if the mail hold request was "initiated" by UBS, Bedrosian signed the one-page form agreeing to

the request.  In fact, Bedrosian *twice* signed a one-page mail hold form telling – and paying –

UBS to stop sending him mail in the United States.  Govt. Ex. F.  The significance of the mail-

hold lies not its initiation, but in the fact that Bedrosian had a mail-hold on the account, he paid a

fee for that service, and the purpose of a mail hold was to prevent correspondence from the foreign bank being tracked by the federal government, and alerting the United States to the possible existence of a foreign account.

Third, Bedrosian does not dispute that he saw an article in the Wall Street Journal about the federal government tracing mail coming into the United States.  He disputes that the article made him "worried."  (Doc. No. 76, p. 9.)  He does not dispute that the article alerted him to the possibility of the United States finding out about his hidden foreign if the bank sent him information through the mail.

Fourth, Bedrosian contends that the United States is asking the Court to conclude that Bedrosian was not credible. (Doc. No. 76, p. 9.)  Specifically, Bedrosian points to his testimony that he did not know, when he filed the 2007 FBAR, that he had two account numbers. Accepting that statement as credible, however, does not resolve the question of recklessness. The question is whether he should have done more than just sign the form without reading it. Trial Tr. 58:12-23.  That question is answered affirmatively when considered in the context of the other evidence and the inferences to be drawn from that evidence.

This was the first time Bedrosian was disclosing on any government form that he had until-then-undisclosed foreign bank accounts.  He was making this first time disclosure years after having been told by his accountant that it was a violation of the law to fail to report a foreign bank account.  The 2007 FBAR was prepared by a new accountant; it was not the accountant he trusted for 30 years.  And he was making this first time disclosure after he admits he "became more concerned" after he spoke with his new accountant.  (Doc. No. 76, p. 5.)  The form was a single page.  Bedrosian had never before filed an FBAR and therefore was unfamiliar with the form.

A person takes a risk any time they sign a form of legal significance without reviewing it. *Bedrosian*, 912 F. 3d at 153; (*see also* Doc. No. 14 (listing cases where courts have repeatedly held that people who sign legal documents without reading them are charged with knowledge of the contents, whether read or not)). When it is a form disclosing a previously hidden foreign bank account, the risk increases. When it is the first time a person is filing such a form, prepared by a new accountant, disclosing a previously hidden bank account, the risk increases even more. By not reviewing the form, but instead signing and filing without reviewing it, Bedrosian ought to have known there was a grave risk the form might not be accurate.

Bedrosian could have easily found out that the form was not correct. He could have reviewed the form and he might have "realize[d]" that UBS had issued him a second account number. (*See* Doc. No. 76, p. 9) (citing to Bedrosian's "testimony that he did not realize UBS had issued him another account number.") Reviewing the form, he might have recognized that the form showed only the *second* account number UBS issued to him in 2005 – which is the account number he claims he did not realize UBS had issued him. *See* Govt. Ex. L, US 243 (reporting 5316 UBS account *but not* his older 6167 UBS account.); *see also* Govt. Exs. E, D, G and H (UBS bank statements listing two separate account numbers – 6167 and 5316 – and balances for the 2005 and 2007 years). And, if Bedrosian reviewed the form he might have remembered that he had balances totaling more than $1,000,000, and that checking the box indicating the account balance up to $1,000,000 was not correct.

Bedrosian could have compared the information reported on the FBAR against documents he possessed or confirm the accuracy of the information on the FBAR by communicating with UBS. During the time Bedrosian failed to report his foreign accounts to the United States, Bedrosian also communicated with UBS. Govt. Ex. I. Bedrosian communicated

with UBS shortly after filing the 2007 FBAR, directing UBS to close the accounts. Govt. Exs. J & K. Bedrosian was able to obtain information from UBS even after he closed his accounts. He obtained enough information that "[b]y the summer of 2010, Bedroisan's accountant had filed all amended returns and original/amended FBARs as far back as 2003. NT 68:1-8." (Doc. No. 76, p. 6). He even volunteered to go to Switzerland and get additional information after he closed the accounts, when he was trying to participate in the Offshore Voluntary Disclosure Program. (Doc. No. 76, p. 7.) Had Bedrosian compared the information he reported on his 2007 FBAR with information that was accessible to him, he would have learned that the 2007 FBAR omitted important information: there was a second account number not reported on the FBAR, and his account balances exceeded $1,000,000.[4]

The record thus establishes that Bedrosian, in signing the 2007 FBAR without reading it or checking it for accuracy, clearly ought to have known there was a grave risk the 2007 FBAR was inaccurate, and he was in a positon to find out for certain very easily. Accordingly, he was reckless in omitting his 6167 account from his 2007 FBAR.

---

[4] As set forth in its opening brief, the United States submits this Court overlooked the inferences to be drawn from undisputed facts established by the evidence at trial. (Doc. No. 75, p. 5-11, p. 19, p. 21 n.10.) Bedrosian filed his 2007 FBAR on October 14, 2008 reporting the smaller of his two accounts – the 5316 account. Govt. Ex. L. Two weeks later, Bedrosian closed his larger, 6167 account and moved the funds to another Swiss Bank. Govt. Ex. J. It appears that Bedrosian travelled to Zurich to move the funds in the larger account to Hyposwiss, as the letter identifies the dates and place of signing as November 4, 2008, Zurich. Govt. Ex. J. A month later, Bedrosian closed his smaller 5316 account and moved the funds to the United States. Govt. Ex. K. The letter closing the smaller account and directing the funds be moved to a bank in the United States identifies the place of signing as Philadelphia, PA. Bedrosian's accountant told him he would have to disclose the account and pay taxes when he or his heirs repatriated the funds. Trial Tr. 51:9-25. The two separate closings and destinations for the funds in each account is compelling evidence Bedrosian's omission was intentional, that he knew he had two UBS accounts, and that he was seeking to avoid paying taxes on the larger account by not repatriating the funds in that account.

**C.  This Court Can and Should Enter Judgment for the Assessed Penalty.**

Bedrosian incorrectly claims that the Third Circuit's remand prevents this Court from entering a judgment for the assessed penalty even if the Court were to now conclude that Bedrosian was reckless in omitting the 6167 account from his 2007 FBAR.  He agrees that the Court declined to consider the amount of the penalty following the trial.  Thus, the issue was not considered by the Third Circuit and not included in the opinion remanding the case.  *See generally Bedrosian*, 912 F.3d at 153 (remanding the case for a *new* judgment to be rendered).  In order to enter a judgment in favor of the United States, the Court must determine the amount of the penalty.  Bedrosian also contends that to consider the penalty amount, the Court needs to open the record.  (Doc. No. 76, p. 10-11).  This contention is erroneous.  First, Bedrosian conceded the penalty assessment was 50% of the 6167 account balance and should be estopped from raising a challenge at the last minute.  Second, the evidence of the account balance is in the record and the penalty is 50% of the account balance.

**1.  Bedrosian is Estopped From Challenging the Amount of Penalty.**

Bedrosian's assertion that he somehow was denied information regarding the calculation of the penalty is entirely unsupported by the record.  Bedrosian admitted throughout the case that the penalty assessed against him equaled 50% of his bank account balance.  (Doc. No. 22-3, ¶ 51 ("The penalty amount was calculated as 50% of Bedrosian's bank account balance for the account ending in 6167, or fifty percent of $1,951,578.34, which equals $975,789.17")); (Doc No. 26-1, ¶ 51 ("Admitted")); (Doc. No. 25-1, ¶ 36 ("The maximum value of the account was $1,951,578.34, and the amount of the penalty was $975,789.19 – half the value of the account and the highest penalty that could be imposed")); (*see also* Doc. No. 49, p. 5); (Doc. No. 31, p. 4

(finding that the penalty the Service assessed against Bedrosian was equal to 50% of the maximum value of the account and was the highest authorized penalty)).

Bedrosian's challenge to the amount in the unreported account is also disingenuous. Trial Tr. 19:13-16 ("Now the government states *and we concede* that at the time there was about 2 million U.S. dollars in that account, give or take") (emphasis added).  While Bedrosian claimed that if a penalty was imposed, it should be an amount less than the maximum 50% penalty, he never challenged that the assessed penalty was equal to 50% of his bank account balance.

Both Bedrosian's assertions in his filings as well as his counsel's statement during the trial qualify as binding judicial admissions.  *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 211 n. 20 (3d Cir. 2006) (a judicial admission is a concession in a pleading or brief that binds the party who makes it); *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972) (finding that unequivocal judicial admissions are binding for purposes of the case in which the admissions are made and that an admission of counsel during a trial is binding on his client).  Judicial admissions cover factual matters that would require evidentiary proof.  *Glick*, 458 F.2d at 1291; *see also Brasure v. Optimum Choice Ins. Co.*, 37 F.Supp.2d 340, 344 (D. Del. 1999) (stating that the purpose of judicial admission "is to reduce the number of factual issues in dispute thereby allowing the parties and the court to focus on the relevant issues").

Bedrosian cannot now assert that he has been denied an opportunity to challenge an issue that he has conceded.  Allowing him to resurrect a challenge to an issue that he conceded would render the concept of judicial admissions meaningless.  This is particularly true here, because Bedrosian explicitly admitted the calculation of the penalty until right at the end of the trial in this case.  Notably, he still does not deny that the correct amount of the penalty equals half of his bank account balance.

**2. The Evidence Establishing the Penalty Amount is in the Record.**

If the Court allows Bedrosian to withdraw his judicial admissions, this Court should still enter judgment for the penalty amount assessed by the Service.  Both parties agree that the penalty assessed against Bedrosian was the statutory maximum.  The Secretary did not exercise discretion to impose a lower penalty.  *See* 31 U.S.C. § 5321(a)(5) (authorizing the Secretary to impose a penalty up to a statutory maximum).  As explained in the United States' Supplemental Brief on remand, Bedrosian did not qualify for a lower penalty under the Service's nonbinding guidance, because his bank account balance exceeded $1 million.  (*See* Doc. No. 75, pgs. 24-27.)  This case does not involve complicated calculations spread over multiple years – it is one penalty for one year equaling 50% of the applicable bank account balance.  Bedrosian tries to complicate the issue, but it is simple math which does not require a review of an administrative proceeding.

The documents submitted by the United States establish the amount assessed was 50% of Bedrosian's bank account balance.  The United States offered into evidence Government Exhibit R, a business record of the monthly balances of Bedrosian's UBS account ending in 6167, which was computed in Swiss francs.  For the first time at trial, Bedrosian objected to Exhibit R, arguing that the document was inadmissible hearsay.[5]  Trial Tr. 135:1-19.

Under the Federal Rules of Evidence, hearsay is a statement not made during a trial which is offered to prove the truth of the matter asserted in the statement.  Fed. R. Evid. 801(c);

---

[5]  At trial, Bedrosian objected to the admissibility of two of the United States' exhibits, Government Exhibits R and T.  As an initial matter, Bedrosian's objections should be overruled as untimely, because they were made well after the August 8, 2017 deadline.  (*See* Doc. No. 34.)  Even after the case was remanded, he did not object to Government Exhibit T; thus it can be considered by the Court.  Gov. Ex. T applies the currency exchange rate for converting Swiss francs to United States dollars (1.126) to the amount in Bedrosian's bank account in June, 2008 (2,197,477.21) to equal $1,951,578.34.

*see also* Fed. R. Evid. 802 (providing that hearsay is not admissible unless the evidence rules provide otherwise).  There is no requirement in the Federal Rules of Evidence that a witness testify about a document before it is admitted, although Bedrosian attempts to imply, without citation to authority, that such is the case.[6]

Certain statements, such as business records, are admissible regardless of whether the declarant is available to testify at the trial.  Fed. R. Evid. 803(6).  Business records are admissible if supported by a declaration showing that the record was made contemporaneously by a person with knowledge, the record was kept in the course of a regularly conducted business activity, and making such a record was a regular practice.  *Id*.  These requirements were satisfied as to Exhibit R by Government Exhibit U.   Government Exhibit U, which was admitted into evidence at trial, is a declaration which meets the criteria contained in Fed. R. Evid. 803(6) and 902(12).  Government Exhibit U states that the attached documents were made contemporaneously by a person with knowledge, were kept in the course of a regularly conducted business activity, and were made as a matter of regular practice.

Bedrosian relies on *Pelullo* to argue that the UBS financial records cannot be admitted as business records.  *See United States v. Pelullo*, 964 F.2d 193 (3d Cir. 1992).[7]  Bedrosian's

---

[6] Bedrosian attempts to undermine the trustworthiness and weight to be given Exhibit R by pointing to testimony of a witness who did not create Exhibit R, or Exhibit U (authenticating Exhibit R as a business record).  (Doc. No. 76, p. 12-13.)  But the witness's testimony was not offered to authenticate Exhibit R as business record.  Bedrosian's contentions in this regard are a nothing more than an attempt at misdirection.

[7] Bedrosian's reliance on *Uitts* and *Saldana* is similarly inapposite.  *See Uitts v. General Motors Corp.*, 411 F.Supp. 1380 (E.D. Pa. 1974); *United States v. Saldana*, 2010 WL 3119967, *14 (Aug. 4, 2010, D.V.I.).  *Uitts* involved car accident reports, not financial records, and the court excluded reports describing different accidents than the one at issue.  The UBS records that the United States seeks to admit are of Bedrosian's bank accounts, not accounts owned by others.  *Saldana* involved a draft policy document by a police officer which lacked confirmation that the

reliance is misplaced.  In *Pelullo*, the plaintiff unsuccessfully attempted to admit financial

records through the testimony of the government agent who analyzed the records.  *Id*. at 200-

201.  The government did not submit certifications of business records from the financial

institutions.  *Id*.  Here, the facts are the opposite.  The government is not relying on the testimony

of the Service employee to authenticate the record (although Bedrosian attempts to make it seem

that way). The government offered a declaration of the custodian of the business records to

establish the records as business records of the financial institution.  Govt. Ex. U.

The Third Circuit in *Pelullo* recognized that witness testimony is not necessary for a

business record to be admitted into evidence; documentary evidence is sufficient as long as it

meets the requirements of Rule 803(6).  *Id*. at 201.  This is consistent with the text of Rule

803(6), which explicitly provides that the qualifications for a business record can be met by

testimony *or* a certification.  *See* F.R.E. 803(6)(D) (allowing a business record to be

authenticated through testimony or a certification under Rule 902(11) or (12); *see also* F.R.E.

902(12) (providing that certified foreign records of a regularly conducted activity are self-

authenticating, which requires no extrinsic evidence for admissibility).  Unlike in *Pelullo*, the

United States submitted a certification of business records from UBS.  Govt. Ex. U.  *Pelullo*

supports the government's position, not Bedrosian's.

Government Exhibit R is a document described in Exhibit U, just as Government

Exhibits E, F, and I (which were admitted into evidence) are documents described in Exhibit U.

*See* Govt. Exs. E, F, I, R; Govt. Ex. U, pg. 3.  Bedrosian did not object to Exhibit U and did not

challenge its trustworthiness.  His objection is focused instead on the manner in which his bank

---

police department adopted the policy.  The United States did not create the UBS records of
Bedrosian's bank account nor are they a draft policy statement.  UBS created and maintained the
records, as one would expect with a bank.

maintained information regarding his account, because it did not put his name and/or the bank name on every single page of its records.  The fact that UBS maintained its records differently than Bedrosian may have liked does not render the financial records inadmissible.

More importantly, Exhibit U meets the requirements of both F.R.E. 803(6) and 902(12). The declaration states, *inter alia*, that the declarant, Britta Delmas, is General Counsel at UBS, that the records were made at or near the time of the occurrence of the matters set forth therein by a person with knowledge, that the records were kept in the course of regularly conducted business activity, and that the activity recorded is a regular practice of the business.  The appendix on line 60, references records by Bates number: D3.US.64.2/174-01540; D3.US.64.2/174-01540_2_00001 through D3.US.64.2/174-01540_6_00921. The lines other than 60 are redacted.  Exhibit R reflects Bates number D3.US.64.2/174-01540_2_00001.  Exhibit E shows the Bates number from this range: D3.US.64.2/174-01540_6_00001-000025.  Exhibit E is the 2005 UBS account statement for Bedrosian's account ending in 6167 (as reflected on page 00001).  Exhibit F, the hold mail documents, also from this Bates range, identifies Bedrosian as the account holder: D3.US.64.2/174-01540_4_00001.  Exhibit I, the record of contacts between Bedrosian and UBS, references him by name on pages 7 and 9 and references him by his title of president and CEO of Lannett on page 8.  D3.US.64.2/174-01540_3_00007-00009.

Accordingly, Exhibit U demonstrates that Exhibit R is an admissible business record of Bedrosian's account.  And, Exhibit R supports a finding that the penalty assessed against Bedrosian equaled 50% of the balance of his bank account.  *See* Govt. Ex. R (providing that Bedrosian's bank account balance in June, 2008 was 2,197,477.21 Swiss francs); Govt. Ex. S (exchange rate for converting Swiss francs to United States dollars was 1.126 in 2008); Govt. Ex. T (applying the exchange rate to the account balance to equal a balance in U.S. dollars of

$1,951.578.34); Govt. Ex. A (the amount of the penalty assessed against Bedrosian was

$975,789.17).[8]  Therefore, a judgment should be entered against Bedrosian in that amount, plus

the uncontested interest and a late payment penalty for a total amount of $1,007,345.48 as of

September 10, 2015, plus the statutory additions accruing after that date until satisfied.

## CONCLUSION

The undisputed evidence before this Court and the inferences that can be drawn from that

evidence demonstrate that, at a minimum, Bedrosian decided to take a calculated risk and act

with reckless disregard for whether or not the FBAR he signed and filed in 2007 was accurate.

The United States is entitled to a judgment against Bedrosian in the amount of $1,007,345.48 as

of September 10, 2015, plus statutory additions accruing after that date, until the judgment is

satisfied.

DATE: April 26, 2019

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General

/s/Kavitha Bondada
KAVITHA BONDADA
KATHERINE M. REINHART
Trial Attorneys, Tax Division
United States Department of Justice
Post Office Box 227
Ben Franklin Station
Washington, D.C.  20044
Telephone: 202.307.6536
Fax: 202.514.6866
Email: kavitha.bondada@usdoj.gov
*Counsel for the United States*

---

[8] In the event the Court were to exclude Exhibit R despite its proper authentication as a business record, two other government exhibits provide information from which the Court could determine the penalty amount.  Govt. Ex. L, US 259 (amended FBAR signed and filed by Bedrosian, listing highest balance in 6167 account during the calendar year 2008 as $2,156,588); *see also* Govt. Ex. H (bank statement as of December 31, 2007, the total value of the unreported account 6167 was $1,667,721(Portfolio 1 + Portfolio 2 – Portfolio 9999)).  Thus, the penalty of 50% would be either $1,078,294 or $833,860.

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing United States' Reply was filed on April 26, 2019 through the

Court's CM/ECF filing system, which will automatically send a copy to the following:

Patrick Egan
Beth Weisser
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, Pennsylvania 19103
*Counsel for the Plaintiff*

<u>/s/Kavitha Bondada</u>
KAVITHA BONDADA